## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 96-CA-01278-SCT

*THE ESTATE OF JOSEPH L. HUNTER, DECEASED
AND IDA MAE ROGERS, WILLIE GREENWOOD
AND JESSIE WARD*

*v.*

*GENERAL MOTORS CORPORATION AND FRANK
WILSON, CHANCERY CLERK OF CLAIBORNE
COUNTY, MISSISSIPPI, AS THE ADMINISTRATOR
OF THE ESTATE OF JOSEPH HUNTER,
DECEASED; AND GENERAL MOTORS
CORPORATION AND CARTER AUTO SALES, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 8/30/96 |
| TRIAL JUDGE: | HON. JOE N. PIGOTT |
| COURT FROM WHICH APPEALED: | CLAIBORNE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN BARRET MARTIN |
| | FRANKLIN G. SHAW |
| | DENNIS C. SWEET, III |
| | DEANNE MOSLEY |
| | WILLIAM F. RILEY |
| ATTORNEYS FOR APPELLEES: | GENE BARRY |
| | DAVID P. STONE |
| | ROBERT L. JOHNSON, III |
| | KYLE H. DREYER |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 1/14/1999 |
| MOTION FOR REHEARING FILED: | 1/28/99 |
| MANDATE ISSUED: | 4/22/99 |

**BEFORE PRATHER, C.J., ROBERTS AND MILLS, JJ.**

**PRATHER, CHIEF JUSTICE, FOR THE COURT:**

## STATEMENT OF THE FACTS

¶1. On March 8, 1992, a tractor-trailer truck driven by Lowell D. Gann and owned by Rowe Machinery Salvage & Sales, Inc. ran a stop sign and collided with a 1981 Oldsmobile Toronado driven by Joseph Hunter. There were three passengers in the Toronado at the time of the accident: Ida Rogers, Willie Greenwood, and Jessie Ward. Officer William Neeley was one of the first officers on the scene of the accident, and he described the scene as follows:

A: The back part of both seats- the back part of the front seat on both sides was pushed forward. The black male that was in the back seat was lying on top of the passenger in the front seat. The driver's head was laying on the dashboard along with Ida Mae Rogers and the black male from the back seat. I mean there were heads laying on the dashboard.

Q: Let me ask you about Ms. Rogers. Was any part of the seat laying up on top of her?

A: Right. The back part of the front seat had been pushed forward from the body- from the two bodies in the back seat of the car.

Q: Where was Mr. Greenwood ?

A: He was on the top of the back part of the seat which was folded down on top of Ida Mae Rogers.

The first witness to the scene, Michael Phillips, testified that the occupants of the Toronado were not wearing seatbelts, and Deputy Neeley also testified to this effect. Jessie Ward maintained, however, that she had in fact been wearing her seatbelts at the time of the accident.

¶2. Hunter died from injuries sustained in the accident, and he was survived by a fifteen-year old son, Joseph Jr. In addition to the death of Hunter, Ida Rogers suffered a subluxation of the spine at the C6-7 vertebral area, causing incomplete quadriplegia. Ida's sister, Jessie Ward, testified that Ida was unable to walk or use her hands to grasp objects as a result of her paralysis. Willie Greenwood suffered a concussion and severe head lacerations in the accident, and he testified to recurring headaches and dizziness following the accident. Dr. Richard Beattie testified that Willie had suffered significant neurological impairment as a result of the accident.

## STATEMENT OF THE CASE

¶3. Following the accident, the passengers and the Estate of Hunter ("the plaintiffs")[1] sued the owner of the truck, William L. Rowe Machinery Salvage and Sales, Inc. and its driver, Lowell Gann, in the Circuit Court of Claiborne County. The passengers also sued the Estate of Hunter, alleging that Hunter's negligence had contributed to the accident. Prior to trial, the Plaintiffs reached a settlement with Gann and his employer, collecting over $1,000,000.00 in settlement proceeds from these defendants. The passengers reserved their claim for negligent driving against the Estate of Hunter, however, thus retaining venue in Claiborne County (and joining the Chancellor as administrator) even though the accident occurred in Adams County.

¶4. The Plaintiffs later joined General Motors and a Port Gibson used car dealer in their lawsuits, and the case against GM proceeded through extensive discovery. The Plaintiffs and Hunter took the depositions of several current and former GM employees, along with the depositions of all of GM's expert witnesses. The case proceeded to trial on August 19, 1996, following which the jury returned unanimous verdicts in favor

of GM and in favor of Hunter as a defendant. The plaintiffs timely filed an appeal to this Court, and the passengers also filed an appeal as to the Estate of Hunter.

## ISSUES

### I. Did the trial court err in not applying the Settlement First Method?

¶5. The plaintiffs argue that the trial court erred in not implementing the "settlement first" method endorsed by this Court in *McBride v. Chevron, USA*, 673 So.2d 372 (Miss. 1996). This argument is without merit. The settlement-first method provides a method of adjusting a verdict against a defendant to reflect an earlier settlement with a joint tortfeasor. See *McBride*, 673 So.2d at 376. Given that the jury returned a verdict in favor of the defendants in the present case, there is no judgment which must be adjusted under the facts herein. Therefore, the settlement-first method is clearly inapplicable to the present case. In addition, it is worth noting that this Court held in *McBride* that:

> This opinion is limited, however, to cases in which, as here, the trial court instructed the jury to consider only the relative culpabilities of the plaintiff and the non-settling defendant(s) in apportioning fault under comparative negligence principles.

*Id.* at 381. The trial judge in the present case instructed the jury to consider the fault of the settling defendant (Gann) in apportioning fault in the present case, and *McBride* would therefore be inapplicable on its face to the present case even if a verdict reduction procedure were required herein, which it is clearly not. This point of error is without merit.

### II. Whether the trial court erred in admitting evidence of the non-use of seatbelts in violation of Miss. Code Ann. § 63-2-3?

### Whether the trial court erred in instructing the jury that the failure of the plaintiffs to wear seat belts could be considered as evidence of contributory negligence, directly contrary to Miss. Code Ann. § 63-2-3 (1996).

¶6. The Plaintiffs argue that the trial court committed reversible error in admitting evidence that the rear passengers were not wearing seatbelts at the time of the accident and in instructing the jury that seat belt non-usage constituted contributory negligence. Miss. Code Ann. § 63-2-3 (1996) provides that:

> This chapter shall not be construed to create a duty, standard of care, right or liability between the operator and passenger of any passenger motor vehicle which is not recognized under the laws of the State of Mississippi as such laws exist on the date of passage of this chapter or as such laws may at any time thereafter be constituted by statute or court decision. Failure to provide and use a seat belt restraint device or system shall not be considered contributory or comparative negligence, nor shall the violation be entered on the driving record of any individual.

Miss. Code Ann. § 63-2-3 thus provides that the non-usage of seat belts may not be "considered contributory or comparative negligence," but the statute does not forbid the admission of evidence of seat belt non-usage outright[2].

¶7. This Court has on two prior occasions reversed cases based at least in part upon the erroneous

admission of evidence of seat belt non-usage. See: ***Roberts v. Graf Auto Co.***, 701 So.2d 1093 (Miss. 1997); ***Jones v. Panola County***, 96-CA-00762 (Miss. May 14, 1998).

## II (a) Is Miss. Code Ann. § 63-2-3 an improper statutory rule of evidence?

¶8. GM raises an argument which was not raised in either ***Roberts*** or ***Jones***, arguing that § 63-2-3 should not be given the effect of a statutory rule of evidence. Specifically, GM argues that:

> Finally, to allow § 63-2-3 to prevent admission of fact testimony that Plaintiffs were not wearing seat belts would equate to a statute to a rule of evidence. In ***Hughes v. Tupelo Oil Co.***, 510 So.2d 502 (Miss. 1987), this Court held that the adoption of the Rules of Evidence, particularly Rule 501, abrogated all statutory privileges. This Court has consistently ruled there can be no statutory rule of evidence. ***Whitehurst v. State***, 540 So.2d 1319, 1323 (Miss. 1989).

¶9. In noting that this Court has held that there can be no statutory rule of evidence, GM is correct. Miss. Code Ann. § 63-2-3 is not an improper exercise of legislative power, however, given that the statute does not purport to bar the admission of seat belt non-usage in all cases, but rather forbids the non-usage of seat belts from being considered as contributory or comparative negligence. While this statute does have significant implications as far as the admission of seat belt evidence is concerned, this fact is hardly unusual, given that substantive rules of law set forth by the Legislature very often have implications in this regard.

¶10. It is apparent that many states have enacted statutes similar to § 63-2-3, and federal courts have grappled with the related issue of whether such statutes constitute substantive rules of law or procedural rules of evidence for ***Erie*** purposes. In ***Barron v. Ford Motor Co. of Canada, Ltd.***, 965 F.2d 195 (7th Cir. 1992), the Seventh Circuit noted that:

> (The North Carolina seatbelt statute) is a rule of evidence if it is motivated by concern that jurors attach too much weight to a plaintiff's failure to wear his seatbelt. It is a substantive rule if it is designed not to penalize persons who fail to fasten their seatbelts. ... The more broadly the North Carolina rule is interpreted, the stronger the inference that its predominant character is that of a rule of evidence. ... If our understanding of the scope of the rule is correct, then the rule is substantive ... "

***Barron***, 965 F.2d at 199-200. A similar holding should apply with regard to § 63-2-3. As long as § 63-2-3 is enforced as written and not given an overbroad application, then the statute is best considered to be a substantive statute rather than an improper evidentiary one.

¶11. This Court concludes that evidence of seat belt non-usage *may* constitute relevant evidence in *some* (but by no means all or even most) cases, so long as (1) the evidence has some probative value other than as evidence of negligence; (2) this probative value is not substantially outweighed by its prejudicial effect (See Miss. R. Evid. 403) and is not barred by some other rule of evidence and (3) appropriate limiting instructions are given to the jury, barring the consideration of seat belt non-usage as evidence of negligence.

¶12. Persuasive authority indicates that Courts applying statutes similar to Miss. Code Ann. § 62-2-3 have permitted the introduction of seatbelt non-usage with appropriate limiting instructions in crash-worthiness cases. In ***DePaepe v. General Motors Corp.***, 33 F.3d 737 (7th Cir. 1994), for example, the trial court granted a limiting instruction which provided in part that:

> You may consider the fact that plaintiff's 1984 Buick Regal was equipped with functional seat belts in

accordance with federal and Illinois law for the purpose of determining whether the overall design of the vehicle was reasonably crashworthy. However, you may not consider plaintiff's use or non-use of seat belts in determining, one, whether the plaintiff was at fault for his own injuries and/or, two, whether plaintiff's use or non-use of his seat belt caused his injury.

*DePaepe*, 33 F.3d at 745. In the view of this Court, the instruction in *DePaepe* effectively balances the manufacturer's right to establish his defense in a crash-worthiness lawsuit while at the same time precluding the jury's consideration of seatbelt non-usage as evidence of negligence.

¶13. It is quite apparent, however, that the instruction in the present case did not make any attempt whatsoever to limit the jury from considering evidence of seat belt non-usage as evidence of contributory negligence. To the contrary, Instruction D2-26 explicitly instructed the jury that:

The Court instructs the jury that Jessie Ward, Willie Greenwood, Ida Rogers, and Joseph Hunter had a legal duty, in the exercise of their reasonable care for their own safety, to use the seat belts that were available to them. If you find from a preponderance of the evidence in this case that Jessie Ward, Willie Greenwood, Ida Rogers and Joseph Hunter failed to use their seat belts, then such failure was negligence. If you should further find from a preponderance of the evidence that such negligence, if any proximately caused or contributed to their injuries, then you cannot award Plaintiffs any damages for injuries that you find from a preponderance of the evidence could have been avoided by the use of the seat belts and you should reduce the amount of your verdict accordingly.

Instruction D2-26 thus constitutes a clear violation of § 63-2-3, and the record indicates that the trial judge was aware of the provisions of this statute. In response to the plaintiffs' objections to the proposed GM instruction, the trial judge stated that:

I'm going to give it. I'm going to give it. And if the Supreme Court wants to say that you don't have to use your seat belts, that you can just sit on the top of the buckles and claim damages, let them say so, you know. That's all right with me. It doesn't bother me at all. I buckle mine, but ...

The judge later stated that:

[I]t's quite likely that the damages in this case would have been substantially less severe if they'd just buckled up the seat belt that was manufactured and put in the car for that purpose. And just because some people got the legislature to pass that (§ 63-2-3), it doesn't bother me at all. All right.

It is thus apparent that the trial judge and GM were both on notice as to the requirements of this statute.

### II(b) Does Miss. Code. Ann. § 63-2-3 apply to a crashworthiness cause of action?

¶14. GM next argues that § 63-2-3 should be held inapplicable in a crashworthiness lawsuit. GM submits that "other courts across the United States have held evidence of seat belt non-use is highly relevant to claims of defective product (sic.) in a crash worthiness case." Ironically, the first case cited by GM in support of this proposition is the *DePaepe* case discussed *supra*, in which the court specifically instructed the jury that:

However, you may not consider plaintiff's use or non-use of seat belts in determining, one, whether the plaintiff was at fault in his own injuries and/or, two, whether plaintiff's use or non-use of his seat

belt caused his injury. *Id.*

While the court in *DePaepe* specifically instructed the jury not to consider seat belt non-usage as evidence of negligence, the judge in the present case specifically instructed the jury that the non-usage of seat belts *was* in fact negligence. Such an instruction constitutes a violation of § 63-2-3, and there is no aspect of a crashworthiness lawsuit which would justify such an instruction in contravention of statute.

¶15. In the present case, there is arguably a legitimate reason for the admission of evidence of seat belt non-usage, given that the plaintiffs contend that the front seat backs failed when they were "loaded" by the rear passengers striking the back of the front seats. In this context, the fact that the rear passengers were (apparently) not wearing seat belts would appear to constitute relevant evidence for the jury to consider in understanding the nature of the crash. In most cases, there would not appear to be any relevant purpose for admitting evidence of seat belt non-usage other than to show negligence, but the present case does appear to constitute an exception.

¶16. In this regard, GM notes that the plaintiffs themselves introduced evidence that the rear seat passengers were not wearing seat belts:

> Plaintiffs' own experts felt it critical to their theory of recovery that the rear seat occupants were unbelted. In short, Plaintiffs and Hunter inserted seat belt non-use into the case by alleging and having their experts testify that the rear seat occupants were unrestrained and moved forward in the accident where they contacted the front seat belts and eventually the front seat occupants. By injecting seat belt non-use into their case as part of their theory of recovery, Plaintiffs and Hunter should not and cannot be heard to complain.

However, the plaintiffs did not waive their right to object in this regard through the introduction of evidence of seat belt non-usage, given that the error arose from the instructions rather than the introduction of the evidence.

¶17. The Legislature, along with the legislatures of many other states, has determined as a policy matter that seat belt non-usage should not be considered negligence, and there is no reading of § 63-2-3 which would exclude crashworthiness lawsuits from the scope of the statute. Miss. Code Ann. § 63-2-3 is supported by the policy consideration that automobile manufacturers should be encouraged to design cars in a crashworthy manner in spite of the fact that drivers and passengers often fail to wear their seat belts. The plaintiffs in the present case contend that the front seats on the Toronado were not adequate to withstand the force of the rear passengers striking the back of the seat, thus causing enhanced injuries among the passengers. It does not strike this Court as unfair that the plaintiffs should be permitted to present such a cause of action to the jury.

### II(c) Does the instruction of the jury that seat belt non-usage by the plaintiffs must be considered as evidence of negligence, in violation of § 62-2-3, constitute harmless error?

¶18. In allocating fault under comparative negligence principles, the jury found that Gann was 100 % responsible for the injuries suffered by the plaintiffs and that both GM and the plaintiffs had no responsibility for the plaintiffs' injuries. GM accordingly argues that any error in instructing the jury is harmless, citing *Horton v. American Tobacco Co.*, 667 So.2d 1289 (Miss. 1995). This Court concludes, however, that the erroneous seatbelt instruction could have had a significant impact upon the jury's central conclusion that

the Toronado was not defective and that any error in this regard can not be considered harmless.

¶19. This Court can not establish that the instruction did not in fact influence the jury's verdict on the crashworthiness issue, in spite of the fact that the jury assigned zero percent negligence to the plaintiffs. It is clear that a jury which has been instructed that the plaintiffs were negligent in failing to use their safety restraint systems is much more likely to find against the plaintiffs in a crashworthiness lawsuit than one which has not been so instructed. This fact may well manifest itself in the form of a verdict for the defendant even absent a specific finding that the plaintiffs were negligent: there can be many influences upon a jury's verdict which are not explicitly noted on the verdict form. The temptation is great for a jury to conclude that a plaintiff which, the judge instructs them, was "negligent" in failing to utilize his safety restraint systems should not have any claim against the manufacturer based on the car's alleged lack of crashworthiness.

¶20. In light of the erroneous instruction submitted to it, the jury could rationally have determined that the plaintiffs' "negligence" in not wearing seatbelts should constitute a defense to GM on the crashworthiness claim, while at the same time concluding that Gann should bear full responsibility for the plaintiffs' injuries in light of his having caused the crash by running a stop sign. These findings are consistent with the jury's finding that Gann bore 100 % responsibility for the plaintiffs' injuries and that GM and the plaintiffs were not responsible for the plaintiffs' injuries.

¶21. It is impossible for this Court to determine that the instruction actually did influence the jury's verdict in favor of GM, but this Court concludes that the party which sought the instruction (GM) should not be given the benefit of the doubt with regard to its effects. The violation of §  63-2-3 in the present case was much more egregious than those in **Roberts** and **Jones** (in which this Court reversed), given that the juries in those cases were not specifically instructed that seat belt non-usage constituted negligence. The instruction in the present case did not merely instruct the jury that it *could* consider seat-belt non-usage as evidence of negligence; it specifically instructed the jury that such non-usage *was* negligence, in direct contravention of statute. Under these circumstances, a finding of harmless error would only be appropriate if it were clear that the instruction did not influence the jury's verdict in favor of GM.

¶22. In addition to the error in granting the instruction, GM compounded the error by arguing on summation that:

> Now I'm not judging anybody's decision to wear a seat belt. That's your own personal decision, but let me tell you what happens when you don't wear a seat belt. You see Mr. Greenwood sitting over there. Let me tell you about the hocus-pocus. Mr. Greenwood, sitting on the back seat, no seat belts on, comes flying through the front, splits the seats apart and loads the windshield ...

> General Motors, based on this instruction, they're not responsible for that injury. There were seat belts in the car. There was a stop sign on Highway 84, and it had no control over either one of those.

The instruction and arguments submitted by GM may well have contributed to the jury's conclusion that the plaintiffs should not recover against GM. Indeed, the plaintiffs filed a motion in limine asking the judge to instruct the jury *not* to consider seat belt non-usage as evidence of negligence, pursuant to § 63-2-3. This motion in limine was denied. This Court holds that the granting of the seat belt instruction constitutes reversible error and we must reverse and remand for a new trial.

### III. Whether the trial court erred in allowing the defense of comparative negligence to

**Estate of Hunter's strict liability/crashworthiness claim?**

¶23. The plaintiffs argue that the trial judge erred in permitting the jury to apply principles of comparative negligence with regard to the crashworthiness cause of action. When Plaintiffs' counsel objected to the comparative negligence instruction in a strict liability case, the trial judge cited **Horton** in overruling this objection. **Horton** did indicate that comparative negligence applies to a strict liability action, but **Horton** did not involve a crashworthiness cause of action. The plaintiffs note that some courts have distinguished crashworthiness lawsuits from other strict liability cases based on the unique aspects of the crashworthiness cause of action, which is concerned with the results of a collision rather than the fault in causing the accident.

¶24. Plaintiffs cite **Reed v. Chrysler Corp.**, 494 N.W.2d 224 (Iowa 1992) for the proposition that:

> The crashworthiness doctrine is a step removed from ordinary strict liability cases. The crashworthiness doctrine proceeds from the belief that a manufacturer has a duty to minimize the injurious effects of a crash, no matter how the crash is caused. ... The theory, which presupposes the occurrence of accidents precipitated for myriad reasons, focuses alone on the enhancement of resulting injuries. The rule does not pretend that the design defect had anything to do with causing the accident. It is enough if the design defect increased the damages. So any participation by the plaintiff in bringing the accident about is quite beside the point.

**Reed**, 494 N.W.2d at 230.

¶25. The **Reed** decision represents the clear minority view on this issue. As noted in a recent journal article:

> As crashworthiness cases become more common, the courts are having to wrestle with whether and how evidence of plaintiff's accident-causing fault is to be considered and compared by a jury in relation to the manufacturer's responsibility for injury enhancement. While plaintiffs have typically argued that accident-causing factors and injury-causing factors are qualitatively different and must be argued separately, the modern trend rejects this piecemeal approach, focusing the inquiry on the product design as an integrated whole and considering all the factors which contribute to the event which causes the injury.

Hildy Bowbeer and Bard D. Borkon, **Recent Developments in Crashworthiness Litigation**, 450 **PLI/Lit** 9, 37 (1992).

¶26. Another recent law journal article notes that the first draft of the proposed Restatement (Third) of Torts had originally set forth the minority view that, in enhancement cases, the plaintiff's fault in causing the accident constitutes an exception to the general apportionment rule set forth in the draft. The article explains, however, that:

> That issue became a major controversy, and the exception was eliminated in Council Draft No. 2, in response to a motion that passed at the May 1994 annual ALI meeting. The example upon which much of the debate focuses is that allowing an exception from apportionment would mean that the drunk driver, whose fault would be relevant as to liability of other negligent persons who caused the initial accident, would recover full enhancement damages against the product defendants. Moreover, as discussed below, it proved exceedingly difficult for the Co-Reporters to distinguish this situation from others where the plaintiff's pre-accident behavior has been held relevant to comparative responsibility apportionment and to justify fault in causing the accident in an enhanced injury case as

the only exception to the strict tort products liability apportionment rule.

William J. McNichols, *The Relevance of the Plaintiff's Misconduct in Strict Tort Products Liability, The Advent of Comparative Responsibility, and the Proposed Restatement (Third) of Torts*, 47 Okla. L. Rev. 201, 275 (Summer 1994).

¶27. It is apparent that at least two distinct issues are raised in the present context: 1) Whether comparative negligence principles should apply in crashworthiness cases at all, i.e. should the jury be permitted to consider the fault of parties whose negligence caused the accident in the same formula in which the jury considers the liability of the crashworthiness defendant ? *and* 2) Once the jury determines that a certain portion of the plaintiff's injuries constitute enhanced injuries attributable to the crashworthiness defendant, should liability for this enhancement portion of the damages be divided among all the parties or should it be the sole responsibility of the crashworthiness defendant ?

¶28. It is apparent that at least part of the ALI controversy, and much of the disagreement among nationwide authority, is concerned with the second issue. This Court need not address this issue in the present case, however, given that this issue only becomes relevant in cases in which the jury has found that enhanced injuries due to crashworthiness defects are present. The jury in the present case did not make a finding that the plaintiffs had suffered enhanced injuries, and we accordingly leave a discussion of this issue for a case in which the issue is properly before us[(3)]. The first issue, while relevant herein, is best discussed in the context of the next point of error, dealing with Miss. Code Ann. 85-5-7, which we deem to be controlling authority in the present crashworthiness context.

> **IV. Whether the trial court erred in submitting for determination by the jury the fault of settling defendant, Lowell Gann. Such action was contrary to this Court's opinion in *McBride v. Chevron*, 673 So. 2d (Miss. 1996).**

¶29. Closely related to the previous point of error is Hunter's contention that the trial court committed error in permitting the jury to consider the fault of the settling defendant, Lowell Gann, in apportioning fault under comparative negligence principles. Rogers argues that this Court's holding in *McBride v. Chevron* prohibits this practice, but this argument is clearly without merit. Indeed, as noted *supra,* this Court in *McBride* implicitly acknowledged that trial judges have the option of permitting juries to consider the fault of settling defendants by limiting the holding therein to cases in which the trial judge had *not* permitted the jury to consider the negligence of all parties. *McBride*, 673 So.2d at 381.

¶30. Moreover, unlike *McBride*, the cause of action in the present case accrued after the passage of Miss. Code Ann. § 85-5-7 (1991), which provides in part that:

> (7) In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault.

This language in § 85-5-7 has given rise to a considerable degree of controversy in the present context. Two commentators writing together on the present issue have stated their view that:

> In order to achieve true equity in this scheme (of comparative negligence), it is necessary that the tortious conduct of *all* participants to the occurrence, including "absent tort-feasors," be considered and apportioned according to the respective degree of fault of each tort-feasor. ... (The) failure to consider the fault of absent tort-feasors in the apportionment process skews the determination of the

percentages of fault to be attributed to tort-feasors before the court. ... Unfortunately, section 85-5-7 is, at first blush, somewhat unclear in stating "whose" fault most be considered in the apportionment process. However, this Article shows that, in concert with the equitable principles underlying comparative fault, section 85-5-7 requires that the fault of *all participants to the occurrence*, including any absent tort-feasor, must be considered in the apportionment of fault.

C. Green and M. Graves, *Allocation of Fault: Joint Tort-feasors in Court and the Ones Who Should Be*, 63 Miss. L.J. 647, 654-657 (1994).

¶31. Another commentator has written that:

The problem with subsection (7) is that it uses the term "party." This is the first and only time that the term appears in the statute. Had the legislature employed one of the previously used terms such as "defendant" or "person," the answer may have been more clear. Strictly speaking, one could interpret "parties" to mean just what it says. That would limit the apportionment to just those defendants the plaintiff decided to bring into the action. However, by including absent tortfeasors within the meaning of "parties," a court may be better able to effectuate the comparative negligence function by considering all parties whose negligence contributed to the injury.

H. Wesley Williams, *1989 Tort "Reform" in Mississippi: Modification of Joint and Several Liability and the Adoption of Comparative Contribution*, 13 Miss. C.L. Rev. 133, 155 (1992).

¶32. This Court agrees with the aforementioned commentators that the policy considerations underlying the comparative fault doctrine would best be served by the jury's consideration of the negligence of all participants to a particular incident which gives rise to a lawsuit. A rule of law limiting a jury to a consideration of the fault of the parties at trial would permit a plaintiff to settle with a defendant primarily responsible for a given accident, file suit against a "deeper pockets" defendant who may bear little if any responsibility for the accident, and thereupon require the jury to allocate all of the responsibility for the plaintiff's injuries between the plaintiff and the non-settling defendant[4]. It would be patently unfair in many cases to require a defendant to be "dragged into court" for the malfeasance of another and to thereupon forbid the defendant from establishing that fault should properly lie elsewhere. Such a procedure invites inequitable results which, in certain cases, could arguably rise to the level of a due process violation.

¶33. The term "party" is a rather vague term. If the Legislature had intended to refer to "parties to a lawsuit" then it could have easily used this language or a similar term such as "litigant", but it did not do so. It appears likely that the Legislature intended to refer generally to a "person or other entity" as the term is often used in a legal context. (e.g. "Whereas the party of the first part ...") By using the term "party" rather than "person" or other such term, the statute includes within its scope businesses, corporations, and other such legal entities.

¶34. Moreover, § 85-5-7(7) provides that the trier of fact should allocate fault to each party "alleged to be at fault." There is no indication that the Legislature intended to reserve for plaintiffs the sole and exclusive right to make allegations of fault before a jury and to deprive defendants of the opportunity to persuade a jury that fault for a given accident lies elsewhere. This State's system of civil justice is based upon the premise that all parties to a lawsuit should be given an opportunity to present their versions of a case to a jury, and the interpretation of § 85-5-7 urged by the plaintiffs would seriously infringe upon a defendant's rights in this regard in many cases.

¶35. Moreover, a consideration of the basic effect of § 85-5-7 does not support the construction urged by the plaintiffs in the present case. The principal effect of § 85-5-7 is that it abolishes joint and several liability for up to 50 % of the plaintiff's injuries and replaces it with a several liability up to this amount. Thus, the statute serves to reduce the extent to which one defendant may be held liable for the negligence of another. It would be contrary to the basic purpose of the statute for the Legislature to set forth within this very same statute a provision which denies defendants the right to present their allegations of fault on the part of another to a jury.

¶36. A recent Iowa law journal article notes that a clear majority of jurisdictions nationwide supports GM's position on the present issue:

> A majority of states with a pure or modified form of several liability that have addressed the issue allow evidence of nonparty fault generally to be introduced into the distribution calculus. The inclusion of nonparties promotes the goal of comparative responsibility. As one court noted, `failing to include (nonparties) in the apportionment process violates the main purpose of comparative fault by improperly subjecting the defendants to liability in excess of their proportion of fault.'

Jonathan Cardi, *Apportioning Responsibility to Immune Nonparties: An Argument Based on Comparative Responsibility and the Proposed Restatement (Third) of Torts*, 82 Iowa L. Rev. 1293 (May 1997). A footnote to this law journal article notes that "nineteen of the states that have addressed the issue, either legislatively or by common law, include nonparty fault generally in allocating several liability."

¶37. The Mississippi Law Journal article similarly notes that:

> In an overwhelming majority of states which have a comparative negligence statute that does not specifically address consideration of the fault of absent tort-feasors (similar to Miss. Code. Ann. § 85-5-7 (1991)) the statutes have been interpreted to allow consideration of all or specifically identified absent tort-feasors in the allocation process.

Green, 63 Miss. L.J. at 658 (footnote 35).

¶38. An illustrative case on point is *Fabre v. Marin*, 623 So.2d 1182 (Fla. 1993)[5], in which the Florida Supreme Court interpreted Fla. Stat. § 768.81(3) (Supp. 1988). This Florida statute provided in part that:

> (3) APPORTIONMENT OF DAMAGES. - - In cases to which this section applies, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability ...

Following extensive briefing on this issue by the parties and amicus curiae for the Florida defense and plaintiffs' bars, the Florida Supreme Court held that:

> We conclude that the statute is unambiguous. By its clear terms, judgment should be entered against each party liable on the basis of that party's percentage of fault. ... Clearly, the only means of determining a party's percentage of fault is to compare that party's percentage to all of the other entities who contributed to the accident, regardless of whether they have been or could have been joined as defendants.

*Id.* at 1185. Importantly, the Court held that the Legislature's abolition of joint and several liability in the

statute indicated an intent to prevent one defendant from being held unfairly liable for the negligence of another. Thus, the Florida statute in question has largely the same effect as § 85-5-7, although § 85-5-7 partly retains joint and several liability (up to half of damages), presumably as a compromise measure. The Florida Supreme Court held that:

> Even if it could be said that the statute is ambiguous, we believe that the legislature intended that damages be apportioned among all participants to the accident. The abolition of joint and several liability has been advocated for many years because the doctrine has been perceived as unfairly requiring a defendant to pay more than his or her percentage of fault.

*Fabre*, 623 So.2d at 1185. This Court finds the view of the Florida Supreme Court to be well-reasoned and persuasive.

¶39. The majority view as stated in *Fabre* is based upon sound considerations of judicial fairness. The Tennessee Supreme Court noted in *Ridings v. Ralph M. Parsons Co.*, 914 S.W.2d 79 (Tenn. 1996) that "fairness and efficiency require that defendants called upon to answer allegations in negligence be permitted to allege, as an affirmative defense, that a nonparty caused or contributed to the injury or damage for which recovery is sought." *Id.* at 81.

¶40. Also illustrative is the fact that, of the nine jurisdictions listed in the Iowa Law Review Article as espousing the minority view, most of them are clearly distinguishable from the legal context of the present case[(6)]. Many of the cases, for example, arose in jurisdictions in which, unlike in this State, defendants have a right to implead third party defendants in order to seek contribution from a joint tortfeasor who has not been sued by the plaintiff. See, e.g.: *Eberly v. A-P Controls, Inc.*, 572 N.E.2d 633, 639 (Ohio 1991). § 85-5-7, by contrast, appears to continue the long-standing rule in this state that contribution among joint tortfeasors is unavailable absent a joint judgment against the tortfeasors, and, unlike in most states, contribution (and thus, impleader based upon contribution) among joint tortfeasors is seriously limited under Mississippi law. See: *Robles v. Gollott*, 697 So.2d 383, 385 (Miss. 1997) (Prather concurring)

¶41. At first blush, § 85-5-7(4) appears to permit contribution, providing that:

> (4) Any defendant held jointly liable under this section shall have a right of contribution against fellow joint tortfeasors. A defendant shall be held responsible for contribution to other joint tort-feasors only for the percentage of fault assessed to such defendant.

However, a closer reading of §85-5-7 indicates that the Legislature did not intend to alter the old law set forth in § 85-5-5 (repealed) which provided for no contribution absent a joint judgment. As noted by Williams,

> Two reasons bolster this conclusion. First, subsection (4) provides that a `defendant shall be held responsible for contribution to other joint tort-feasors only for the percentage of fault assessed to such defendant.' The italicized terms must refer to tortfeasors who were already made parties to the action. Any other interpretation is nonsensical. Thus, the provision appears to be couched in terms which indicate that contribution is only permitted among tortfeasors brought into the action by the plaintiff. The second reason is that subsection (6) provides that a defendant held jointly and severally liable on a theory of concerted action or common plan shall have a right of contribution `from his fellow defendants acting in concert.' The clear import of this statement is that the legislature only intended to

grant a right of contribution to defendants as against other defendants made parties to the action by the plaintiff.

Williams, 13 Miss. C.L. Rev. at 167. This interpretation of § 85-5-7 set forth by Williams is the most logical one which may be made from the statute. There is no indication that § 85-5-7 alters the traditional law barring contribution absent a joint judgment, and the plaintiffs in the present case do not contend otherwise.

¶42. Although Mississippi has enacted Mississippi Rules of Civil Procedure ("MRCP") Rule 14 providing for impleader, this rule is of little use to a defendant who lacks a substantive right of contribution[7]. The comment to Rule 14 provides that:

> It is essential that the third-party claim be for some form of derivative or secondary liability of the third-party defendant to the third-party plaintiff ... It is not available for example, to bring in a party solely on the ground that he is or may be liable to the original plaintiff. Thus, an allegation that the third party is a joint tortfeasor or is the one really liable to the original plaintiff is insufficient to state a third-party claim.

M.R.C.P. 14 cmt. (citations omitted). Given that it is thus apparent that, fairly or unfairly, contribution and impleader remain largely unavailable to defendants in this State, it becomes particularly important in the context of this State's jurisprudence that the plaintiff not be given the sole power to determine among which parties the jury is able to allocate fault. While the majority view arguably constitutes the more equitable approach even in jurisdictions which permit contribution and impleader based on contribution, the minority view would be particularly unfair to the rights of the defendant in a jurisdiction such as Mississippi, in which these procedures are largely unavailable[8].

¶43. The plaintiffs argue that allowing juries to consider the fault of settling defendants such as Gann in allocating fault permits non-settling defendants such as GM to improperly shift responsibility to parties not present before the jury. The fact remains, however, that plaintiffs such as Hunter can and do attempt to establish to the jury that fault for the accident in question properly lies with the defendants at trial rather than with any absent parties. At trial below, counsel for the plaintiffs effectively stood in the shoes of the settling defendant Gann and argued that he bore little if any of the responsibility for the injuries which the plaintiffs suffered. The plaintiffs were able to vigorously present this argument to the jury; while, under the alternative procedure, the jury would have been unable to consider the actions of Gann at all in allocating fault.

¶44. The absence of a right to contribution absent a joint judgment renders this issue a clear one in the context of the jurisprudence of this State. This Court holds that the term "party," as used in § 85-5-7(7), refers to any participant to an occurrence which gives rise to a lawsuit, and not merely the parties to a particular lawsuit or trial.

### V. Whether the trial court erred in overruling Estate of Hunter's Motion in Limine to exclude the blood alcohol level of Joseph Hunter?

¶45. Hunter argues that the trial court erred in overruling his motion in limine to exclude evidence of his blood alcohol level. Tests results indicated that Hunter had some alcohol in his system, but that the amounts were within the legal limit. All of the passengers in the car testified that Hunter was driving properly. Hunter submits that the test results are unreliable in that the source of the blood sample could not be properly

identified, that the sample was not taken under sterile conditions, that the sample was not properly preserved after the collection of the fluid, and that the chain of custody was broken.

¶46. This Court's standard of review of the trial court's admission or exclusion of evidence is the abuse of discretion standard. ***Thompson Mach. Commerce Corp. v. Wallace***, 687 So.2d 149, 152 (Miss. 1997). This Court has held evidence of blood alcohol levels to be admissible in automobile negligence cases. ***Allen v. Blanks***, 384 So.2d 63, 67 (Miss. 1980). The trial judge was within his discretion in overruling this motion in limine, and this point of error is without merit[(9)].

### VI. Whether the trial court erred in failing to instruct the jury on plaintiff's claim for negligence, failure to warn, misrepresentation and breach of warranty.

¶47. The plaintiffs argue that the trial court erred in failing to instruct the jury on their claims against GM for breach or warranty, failure to warn, misrepresentation, and negligence. With regard to the breach of warranty claim, GM correctly notes that the breach of warranty claim on the 1981 Toronado is barred by the statute of limitations, which bars breach of warranty claims six years from the date of delivery of the product. Miss. Code Ann. § 75-2-725 (1972). With regard to the failure to warn cause of action, GM argues that "[p]laintiffs did not present evidence sufficient to create any jury issue in regard to a failure to warn. Plaintiffs did not put on any proof as to what type of warning should have been given or if a warning would have been given, Plaintiffs would have heeded the warning." The trial judge committed no error in declining to grant the failure to warn instruction. The judge similarly committed no error in refusing a "misrepresentation" instruction, which has no apparent basis in the evidence.

¶48. Finally, the plaintiffs argue that the trial judge erred in not granting a negligence instruction, in spite of the fact that the jury was provided with an instruction on the risk-utility test for strict products liability. The plaintiffs' argument loses much, if not all, of its force in light of this Court's decision in ***Sperry-New Holland v. Prestage***, 617 So.2d 248 (Miss. 1993), which adopted the risk-utility test for determining whether a product contains a design defect. In the influential case of ***Prentis v. Yale Mfg. Co.***, 365 N.W.2d 176 (Mich. 1984), the Supreme Court of Michigan noted[(10)] that:

> The risk-utility balancing test is merely a detailed version of Judge Learned Hand's negligence calculus. See ***United States v. Carroll Towing Co.***, 159 F.2d 169, 173 (C.A. 2, 1947). As Dean Prosser has pointed out, the liability of the manufacturer rests "upon a departure from proper standards of care, so that the tort is essentially a matter of negligence." ... As a common-sense matter, the jury weighs competing factors presented in evidence and reaches a conclusion about the judgment or decision (i.e., conduct) of the manufacturer. The underlying negligence calculus is inescapable. As noted by Professor Birnbaum: "When a jury decides that the risk of harm outweighs the utility of a particular design (that the product is not as safe as it *should* be) it is saying that in choosing the particular design and cost trade-offs, the manufacturer exposed the consumer to greater risk of danger than he should have. Conceptually and analytically, this approach bespeaks negligence."

***Prentis***, 365 N.W.2d at 184 [citations omitted]. The Court accordingly held that:

> [I]n a products liability action against a manufacturer, based upon defective design, the jury need only be instructed on a single unified theory of negligent design.

***Id.*** at 187. This Court finds the view expressed by the Michigan Supreme Court in ***Prentis*** and by the legal

scholars cited in the opinion to be persuasive. An examination of the risk-utility test establishes that the test is essentially a negligence test, and the trial court committed no error in failing to grant a negligence instruction in addition to the risk-utility test. This point of error is without merit.

> **VII. Whether the trial court abused its discretion in failing to grant a new trial on the grounds of discovery abuse. General Motors Corporation failed to disclose to plaintiffs the existence of at least 85 boxes of documents which GM had produced in other seat belt litigation. GM's experts and corporate representative testified that GM's "design philosophy" was to design and test seat backs to twice the FMVSS standards. Some documents which GM had failed to produce and which plaintiffs received during trial from outside sources revealed that GM had no design philosophy for seat belt strength**.

¶49. The plaintiffs argue that the trial judge committed reversible error by denying a motion for new trial based on alleged discovery abuses by GM. The plaintiffs argue that GM improperly failed to disclose the existence of various evidence which had been produced by GM in other cases involving allegations of defective seat backs. In particular, the plaintiffs point to the videotape testimony of Ted Bertacini, a former GM employee whose testimony, they contend, demonstrates that GM lacked a design strategy with regard to seat back safety. The plaintiffs also object that they did not discover the existence of certain other allegedly helpful evidence until after trial. Specifically, the plaintiffs note that "[a]fter this trial was concluded, the Estate of Hunter learned that General Motors had identified more than 30 boxes of documents of the `Viano Collection' and more than 55 boxes of documents of the `All Belts to Seats Collection' in other seat back failure cases."

¶50. Given that this Court has elected to reverse on other grounds, we conclude that the plaintiffs should be permitted an opportunity on remand to argue in favor of the admission of the documents which they discovered during and after trial. The admissibility of this evidence should be determined by the trial judge on remand, and this Court makes no finding in this regard. The parties should be given an opportunity to conduct additional discovery on remand, and this Court directs that all parties comply with the applicable discovery rules.

> **VIII. Whether the trial court abused its discretion in failing to grant a new trial when the jury foreman testified in post-trial proceedings that she had been advised during the trial that the plaintiffs had been "paid off" by a settling defendant. Whether GM committed pre-trial violations vis a vis the jury panel.**

¶51. After the verdict in favor of GM was issued, the plaintiffs called the juror foreperson, Catherine Knox, who testified that:

Q: Ms. Knox, just a couple of questions for you. During the jury deliberations, did someone or was it mentioned or did someone say that there had been a settlement by any of the plaintiffs and the amount of money that had been received ? From the trucking company.

A: No, I don't remember anybody saying that there had been - how much somebody had received, but I did hear that the trucking company had paid off.

Q: Was that during the course of the trial ?

A: Yes, I guess so.

Q: Alright. Do you know who you heard that from ?

A: No, I don't.

The plaintiffs argue that Knox thus gained improper knowledge of the settlement with Gann. The plaintiffs argue in the very same brief, however, that the trial court erred in *not* informing the jury that Gann had settled. The plaintiffs submit that the trial judge should have informed the jury of the settlement while at the same time instructing the jury to disregard the settlement when considering the negligence of GM. The fact that the juror foreperson learned about Gann's settlement is not surprising considering the small town in which the case was tried. At the same time, however, it would certainly be preferable that the juror foreperson had not gained this information in such a manner.

¶52. The plaintiffs also called to testify Clarence Scutter, a local mailman who served as jury consultant to GM. The passengers/cross-plaintiffs assert in their brief that:

> After the completion of voir dire examination of the jury by counsel for Rogers, Greenwood, and Ward, plaintiffs discovered that General Motors was being assisted in jury selection by Clarance Scutter, the United States Postman who delivered the majority of the summonses to the jurors. The panel was clearly poisoned. Clarance Scutter either delivered mail or personally knew 14 members of the jury venire, six of which ultimately served on the jury, plus the alternate.

The passenger-plaintiffs later allege that:

> At a pre-trial conference held on August 5, 1996, the trial court ordered that the jury venire not be made available to the parties prior to the morning of trial. Undaunted by the Court's order, General Motors devised another way to secure the identity of the potential jurors, namely by hiring the Port Gibson mailman, Clarance Scutter, as a "Jury Consultant."

¶53. The plaintiffs were not able to present any evidence to support their allegations that GM hired the mailman as jury consultant in order to gain otherwise protected information about the makeup of the jury venire. However, even if no improper conduct actually occurred, as GM vehemently asserts, the hiring of the very same mailman who delivers the summonses to the jury brings a taint of unfairness, real or perceived, to the pre-trial proceedings. In fairness to the plaintiffs, assuming that the mailman did in fact provide this information to GM, it would be virtually impossible for the plaintiffs to establish this fact absent an admission by the parties involved.

¶54. This Court concludes that this practice, which has a potential to bring discredit to the bar in the eyes of the public, should be strongly discouraged. Clearly, there are persons other than mailmen who are capable of providing insights into the makeup of jurors in the community, and the hiring of such mailmen could give the impression that they are being hired for their access to the summonses mailed to prospective jurors. These allegations of improper juror knowledge and of questionable pre-trial tactics likely do not constitute reversible error in and of themselves, but within the context of other errors committed at trial, we find these issues to be supportive of a reversal and remand for a new trial.

## CONCLUSION

¶55. The cumulative effect of the errors at the trial court below is sufficient to warrant a reversal and a

remand for new trial. The trial court erred in instructing the jury that seat belt non-usage constituted negligence, in violation of Miss. Code Ann. § 63-2-3. GM compounded this error by arguing to the jury that the plaintiffs' failure to wear their seat belts contributed to their injuries in the present case. In spite of the fact that the jury did not assign a percentage of fault to the plaintiffs, it can nevertheless not be said that this error was harmless. It is clear that a jury which has been specifically instructed that the plaintiffs were negligent in failing to utilize their safety restraint systems is much more likely to issue a verdict against the plaintiffs in a crashworthiness lawsuit than a jury which has not been so instructed.

¶56. This Court also concludes that, on remand, the trial court should specifically instruct the jury that GM may be held liable for crashworthiness defects even if the defects did not cause or contribute to the initial crash. An instruction in this regard serves to acknowledge the unique nature of the crashworthiness lawsuit, while at the same time permitting the defendant to argue that responsibility for the plaintiffs' injuries should be allocated elsewhere. This Court further directs that the jury on remand shall consider the fault of all parties who may have contributed to the plaintiffs' injuries, including absent parties such as Gann. See Miss. Code Ann. §  85-5-7(7) (1991).

¶57. Finally, GM's questionable decision to employ as a "jury consultant" the very same mailman who delivered many of the summonses to the jury gives rise to an appearance of possible unfairness in the pre-trial proceedings, even if, as GM insists, no improper conduct actually occurred. It is also unfortunate that the jury foreperson learned during trial that the plaintiffs had settled with the truck driver and his employer. While likely not justifying a new trial in and of themselves, these incidents lend further support to a conclusion that the trial below was an unfair one and that the present case should be remanded for a new t rial.

¶58. A review of the record leaves serious doubt as to whether the plaintiffs were presented with a fair opportunity to recover for the catastrophic injuries which they suffered in the present case. The judgment of the trial court is reversed and remanded for a new trial.

¶59. **REVERSED AND REMANDED FOR A NEW TRIAL.**

**PITTMAN, P.J., BANKS, ROBERTS, SMITH, MILLS AND WALLER, JJ., CONCUR. McRAE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J.**

**McRAE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶60. Today the majority provides qualified justice. Indeed, I concur with the result of reversal and remand. Victims to such an accident need proper treatment by the courts. Yet, the majority still neglects their rights in its opinion. A proper result-- reversal and remand--is not perfected unless one effects the proper rationale and analysis underlying that result. The result is hollow if the court below cannot properly dispose of the case on remand, because the majority tied it with improper legal directions. Proper treatment of the parties requires this Court to provide an injured party the opportunity for remedy. Hence, I agree with the

result to reverse and remand, but I must dissent as to the analysis utilized in such a result.

¶61. In his seminal work, Professor W. Page Keeton reminds us of what is torts law:

> [I]t has been said that torts consist of the breach of duties fixed and imposed upon the parties by the law itself, without regard to their consent to assume them, or their efforts to evade them. . . . [Hence,] [t]here remains a body of law whch [sic] is directed toward the compensation of individuals, rather than the public, for losses which they have suffered within the scope of their legally recognized interests generally, rather than one interest only, where the law considers that compensation is required. This is the law of torts.

W. Page Keeton et al., **Prosser and Keeton on the Law of Torts** § 1, at 4-6 (5th ed. 1984).

¶62. Professor Keeton tells us that torts is the body of law which compensates parties for injuries suffered. Today, the majority chooses to avoid this admonition. The majority chooses to recreate centuries of torts law. The majority tells us that those harmed are not necessarily entitled to the compensation they deserve in spite of the fact that Article 3, Section 24 of our Mississippi Constitution states that where there is an injury due process requires a remedy. *See id.*

¶63. The majority further desecrates the definition of what is a tort by construing already damaging § 85-5-7, in a light favorable to parties inflicting harm. Section 85-5-7(2) limits joint and several liability of multiple defendants to the situation where the plaintiff needs such a liability scheme to attain 50% of recoverable damages. The majority construes § 85-5-7 such that the majority's language, read in concert with the statute, virtually eliminates recovery by a plaintiff.

¶64. Indeed, the majority refers to the term "party" as a "rather vague term." I query as to what is so vague about it. Regardless, the majority then defines "party," as stated in § 85-5-7(7), as any person--natural or artificial--giving rise to a suit, not only those engaged in litigation. Such a definition constricts the presentation of joint and several liability even more than the damage erected by the statutory language itself, because it creates the possibility of effectually obviating a plaintiff's opportunity to recover. Indeed, who would have to defend the "phantom parties" of negligence, breach of contract, strict liability, or absolute liability? Consider that if, say, ten "parties" were determined equally liable for a tort, any tort from physically, emotionally, or financially disabling to minor inconvenience, but only two "parties" were litigants, then plaintiff could only recover up to 20% of the effected damages. How can this be justice? Fifty percent is questionable justice. Twenty percent is egregious catering to big business defendants and loathsome disregard for those who cross big business's path. Where does tort law--the law of remedying harm--allow such behavior by courts and defendants? In the past, contributors were responsible for all damages under the policy perspective that the tortfeasor, not the injured party or the public, should pay. *See Teche Lines, Inc. v. Pope*, 175 Miss. 393, 166 So. 359 (1936). The majority's definition grants license to actors to operate without consideration of potential harm. Strict liability law--especially that of products liability--will be crushed below the heel of profits and bottom lines. What good will centuries of law be if corporations may act without the check of consumer protection?

¶65. So, what is so vague about "party"? I have always deemed it axiomatic that "party" meant someone or some entity named and participating in the litigation. Yet, if the majority wishes to question the term, it would be wise to do that which the majority neglects--we should properly define the term. Hence, how is the key word, "party," defined by the definitional legal authorities? **Black's Law Dictionary** states that:

A 'party' to an action is a person whose name is designated on record as plaintiff or defendant. . . . 'Party' is a technical word having a precise meaning in legal parlance; it refers to those by or against whom a legal suit is brought, whether in law or in equity, the party plaintiff or defendant, whether composed of one or more individuals and whether natural or legal persons; all others who may be affected by the suit, indirectly or consequently, are persons interested but not parties.

**Black's Law Dictionary** 1122 (6th ed. 1990) (citations omitted). "Party" is defined in an equivalent fashion in **Am. Jur. 2d**:

For litigation there must be a controversy and for a controversy there must be adverse parties. The prime object of all litigation is to establish a right asserted by the plaintiff or to sustain a defense set up by the party pursued, and it is indispensable in the filing of a declaration, complaint, or petition in a civil action or proceeding that there be shown a party plaintiff and a party defendant. The object of making a person a party to a legal proceeding is to enable him or her to be heard in the assertion of his or her rights, and failing to set them up, to preclude that person from again litigating them, and also to enable the court to entertain the action.

59 **Am. Jur. 2d** *Parties* § 1 (1987).

¶66. Parties are necessary if we are to have litigation, thus the statute, which regards litigation, is null and void if "party" in § 85-5-7 is not construed as meaning parties to litigation. The term "party" is used only once in § 85-5-7. That single time is in § 85-5-7(7). Yet, one can easily construe that the one statement of the term refers to parties in litigation. The entire statute deals with resolution of a tort action, i.e., litigation. Further, the trier of fact only determines fault percentages for parties alleged to be at fault. One may be alleged to be at fault only if one is named in the lawsuit. If one is named in the lawsuit, then one is a party to the litigation. How can the majority make such a claim that a party is not necessarily a litigant? The majority neglects the law of this state which says: "the principles of enlightened jurisprudence . . . will not permit a party suffering a wrong to be deprived of his right to redress by any purely technical reasoning." ***See Bailey v. Delta Elec. Light, Power & Mfg. Co.***, 86 Miss. 634,637, 38 So. 354 (1905). Today, the majority is not only purely "technical," it is purely incorrect.

¶67. Knowing the authors of § 85-5-7, I am hesitant to criticize the statute's language. However, the statute is clearly contrary to our constitution. Further, the statute is problematic if a court is attempting to instruct a jury to bring in all of the players involved with the elements of absolute liability, strict liability, negligence, failure to warn, and breach of contract. How do you reasonably mix in strict liability that has no negligence as an element to apportion out a percentage of fault with other negligent actors? The act of mixing absolute liability, negligence, breach of contract and strict liability causes of actions in order to apportion a percentage of fault to each defendant will not work. Indeed, some of these causes of action do not have negligence in them, some have higher burdens placed on them. How can a jury honestly place a percentage of fault on each defendant? More importantly how does the trial court instruct a jury? Under our constitution, there is a remedy for any wrong inflicted on a victim. Obviously this will not occur.

¶68. Indeed, how does one inform the jury that the jury members must apportion out a wrong as negligence where there is strict liability though no negligence on the part of the manufacturer? Or, how does one aptly instruct a jury that it must treat a case as negligence where the defendant was handling dynamite and should be under the law of absolute liability? The statute lacks any requirement that burdens be shown by a party.

Strict liability is not negligence. Strict liability simply requires proof of a defect, causation, and damages, or, in risk-utility, evidence that the defendant used a lesser design or lesser method than that which was available at the time of the action. The classic elements of negligence are a duty, breach of duty, causation, and damages. How can one create a comparison and a proportionality to the aforementioned diametrically opposed theories of tort action and say the plaintiff may only recover a restricted amount yet must defend all of the issues when the defendant brings the phantom parties into play on these different causes of action? Further, the majority provides nothing as to who maintains the burden of proving when the defendant may simply toss in names from all over the country that were "parties" in one capacity or another. Those "parties" pegged by the defendant are not parties to the litigation.

¶69. Does due process exist when, as stated by the majority, there is a third party claim or a subsequent suit to attain contribution from other defendants despite the fact the targeted defendant was not party to the first suit and is now potentially responsible for 80 or 90 percent of the negligence established in that first suit? I think not. Whatever does exist, if categorized as due process, perverts what is due process. Indeed, the majority's perspective is contra our civil procedure rules, which require parties to a case be made a party to the law suit such that the plaintiff may receive the contribution due while the defendants may subsequently fight amongst themselves as to the amount each should pay. *See* Miss. R. Civ. P. 19. The plaintiff should not have to constructively defend the phantom defendant.

¶70. The majority makes much ado of the fact that the plaintiff may receive a windfall. Yet, I perceive that under our jurisprudence the plaintiff would be subjected to more harm in contravention of ***McBride v. Chevron U.S.A.***, 673 So. 2d 372 (Miss. 1996), than otherwise would be the case. Consider the plausible case of an employee working for a manufacturer who is sued under a strict liability theory. In such a case, the manufacturer may bring in contractors and sub-contractors who installed machinery in the plant. The employer may also be dragged into a case under the premise that the employer was negligent due to some modification to the machinery. Then as to immunity, specifically deemed unaffected by the statute in §§ (8), the employer is not required to defend the suit and pays no money while the employee is required both to defend the employer without benefit of the employer's contribution of expenses. Further, the employee must return to the employer the funds attained through worker's compensation. Given such a situation, there is no way of determining strict liability or apportioning between the two causes of action, or between the parties. Contrary to the plight of the employee, if the employer is found greater than 50 % at fault, the employer does not lose the funds the employer was compensated. Indeed, the employer gets all the funds despite having a higher degree of negligence than the employee. Such is neither justice nor due process.

¶71. Further, the statute fails to account for what happens when one is faced with an uninsured motorist claim and attempts to collect under uninsured motorist coverage but other parties are involved. How does one apportion out the negligence of the uninsured or underinsured with their own and the other parties involved? How does such a situation equate with the theory of joint and several liability? While the plaintiff pays an insurance premium for negligence to which an uninsured motorist contributed, the plaintiff is unable to collect any or all of his money for the negligence. Such is particularly so where the plaintiff sues not the uninsured motorist, but only sues the insurance company for breach of contract due to the uninsured motorist's negligence or contribution. Consider also the scenario where the uninsured motorist is only 10 % at fault while two or three other defendants are liable for the remaining 90 % of fault. In such a situation, the majority's equation relegates the plaintiff to recover solely 10 % from the contract the plaintiff personally purchased.

¶72. Therefore, given the above analysis, I find error in allowing the jury to consider the fault of the settling defendant, Lowell Gann. Accordingly, I concur in the result to reverse and remand for trial, yet I worriedly dissent as to the majority's rationale and analysis.

**SULLIVAN, P.J., JOINS THIS OPINION.**

1. The present appeal concerns lawsuits filed by the Estate of Hunter and the passengers of the Toronado against GM, as well as a suit filed by the passengers against the Estate of Hunter based on his allegedly negligent driving. The passengers and the Estate of Hunter are collectively referred to as "the plaintiffs" in their capacity as plaintiffs in the suit against GM.

2. Miss. Code Ann. § 63-2-7 (1996) does provide for that a failure to wear seat belts is a misdemeanor punishable by a fine of twenty-five dollars, but this statute is inapplicable to the issues in the present case.

3. It is apparent that at least some of the concerns of the minority view can be addressed by a limiting instruction to the effect that a defendant may be liable for enhanced injuries caused by crashworthiness defects, even if the crashworthiness defects did not cause or contribute to the accident in question. This Court recommends that such an instruction be granted in crashworthiness cases, including in the present case on remand. This Court does not hold that the failure to grant a similar instruction in the present case constitutes reversible error in light of the fact that the plaintiffs' proposed instruction in this regard contained additional language to which GM successfully objected.

4. Consider the example of a car accident in which plaintiff is injured in a collision with a car driven recklessly by a drunken driver and with a truck working for a local business. The evidence indicates that the drunken driver was 98 percent responsible for the accident and that the truck driver was 2 percent responsible. Finding the drunken driver to lack significant resources, the plaintiff settles with this drunken driver for a modest sum and grants him a full release (or merely elects not to sue him). The plaintiff then proceeds to file a suit solely against the business which employed the 2% at fault truck driver. The interpretation of § 85-5-7(7) which Hunter urges would grant the plaintiff the sole power to control the parties to the lawsuit and thus the evidence considered by the jury.

5. A footnote in this opinion dealing with a set-off issue was later overruled. The central holding of the case remains good law.

6. At least one case which follows the minority view arose in a jurisdiction which, unlike Mississippi, has not abolished or curtailed joint and several liability. See: *Anderson v. Harry's Army Surplus, Inc.*, 324 N.W.2d 96, 100 (Mich. Ct. App. 1982). Other cases listed as espousing the minority view arose out of statutes which provide a definition of "party" which renders the cases clearly distinguishable. In *Baldwin v. City of Waterloo*, 372 N.W.2d 486, 493 (Iowa 1985), for example, the Iowa comparative fault statute, unlike § 85-5-7, provided a definition of "party" which specifically included within the classifications of "party" a "third-party defendant" as well as a "person who has been released pursuant to section 668.7 (general release/covenant not-to-sue statute)."

In *Baker v. Webb*, 883 S.W.2d 898, 899 n.2 (Ky. Ct. App. 1994), the Kentucky statute in question

(KRS 411.182) similarly required that the jury allocate fault to the parties "to the action," and the jury was to determine the fault of "each claimant, defendant, third-party defendant, and person who has been released from liability under subsection (4) of this section" (dealing with releases, covenants not to sue, etc.). Although thus technically espousing the minority view, the Iowa and Kentucky statutes are clearly distinguishable from § 85-5-7, in that they permit (and require) the jury to consider the fault of third party defendants and of parties who have been released from liability. Under the facts of the present case, Gann is such a party released from liability, and it is thus apparent that GM would have been permitted to have Gann's fault determined by the jury even under these "minority view" cases.

7. Williams argues that "without a substantive right of contribution, the only `fair' aspect of the system is that it is `fairly' one-sided in favor of the plaintiff." Williams, 13 Miss. C.L. Rev. at 152.

8. The plaintiffs argue that, if this Court should elect to adopt the construction of § 85-5-7 urged by GM, then this Court should overrule the 1977 case of *Wood v. Walley*, 352 So.2d 1083, 1085 (Miss. 1977), providing for a dollar-for-dollar credit to non-settling defendants for settlements made by the plaintiff. It is worth noting, however, that, at the time *Wood* was decided, trials courts already instructed the jury to consider the fault of absent tortfeasors in many cases, and there is nothing in *Wood* which indicates that the decision is inapplicable in such cases. At any rate, this issue is not squarely before this Court, and we leave a decision on this issue to a later date.

9. It should be noted that GM did not attempt to introduce any blood alcohol test results, and this point would accordingly appear to be largely moot. Ironically, counsel for Hunter informed the jury during voir dire that Hunter's blood alcohol level was .09, within legal limits.

10. The Court in *Prentis* also held that, where the risk-utility test was given, the failure to grant a breach of warranty instruction was not reversible error. *Prentis*, 365 N.W.2d at 186.