MYERS, P.J.,
 

 for the Court:
 

 ¶ 1. Randy Coleman (Randy) was severely burned when his 1999 Ford F-150 pickup truck caught fire after a head-on collision with another vehicle. He died of his injuries twenty-eight days later. His wife, Sandra Coleman (Coleman), brought a wrongful death suit against Ford Motor Company, alleging that the F-150 truck had burned because of a defective fuel line. A jury found that the vehicle was not defective. On appeal Coleman argues,
 
 *226
 
 among other things, that the jury should not have been allowed to hear evidence that her husband had caused the accident while driving under the influence of alcohol.
 

 FACTS
 

 ¶ 2. Early in the afternoon of March 23, 2001, Randy was driving his 1999 Ford F-150 4x4 east on MS-14 between Louisville and Macon. MS-14 is a two-lane, undivided highway. Janice Hudson was driving a Chevrolet Silverado pickup truck in the westbound lane. Hudson’s passengers testified that as Randy approached, he was driving at a high rate of speed in the wrong lane. As the two converged, Hudson attempted to avoid Randy by slowing down and moving into the left lane, but she was unable to avoid a collision as Randy returned to his proper lane of travel. The damage to both vehicles was described as severe; Hudson was killed instantly, and both of her passengers were injured. Randy was trapped in his vehicle and mortally burned after it caught fire. According to Ford’s expert, subsequent tests revealed that Randy’s blood-alcohol content had been 0.23 percent at the time of the collision.
 

 ¶ 3. After her husband’s death, Coleman brought a wrongful death suit against Ford. She alleged that the fire had started after the collision when gasoline leaked from a flexible fuel line on the F-150 truck. The flexible fuel line, she claimed, was not adequately shielded and should have been reinforced. She proposed several alternative designs, including adding a nylon shield or encasing the line in stainless steel braiding, that would have survived the crash without leaking gasoline. Ford denied that its design was defective, citing the severity of the crash. Ford also insisted that the fire had originated inside the cab, with the initial fuel source being a punctured can of liquid electrical tape.
 

 ¶4. After extensive pretrial litigation, the case was tried to a jury, which returned a special verdict finding that Randy’s 1999 F-150 4x4 was not defective. The jury made no further findings.
 

 DISCUSSION
 

 1. Comparative Fault
 

 ¶ 5. In her first issue, Coleman argues that the trial court erred in admitting evidence of comparative fault in causing the accident leading to the fire that killed her husband. Ford was permitted to offer a comparative negligence defense, that is, to argue that even if the F-150 was defective and had injured Randy, his (or Hudson’s) negligent driving had contributed to his injuries, and that any award of damages should be reduced to Ford’s share of fault. Coleman contends that her suit against Ford only sought damages for enhanced injuries — those that would not have been suffered if the vehicle had not been defective — and that evidence unrelated to the crashworthiness of the vehicle was irrelevant. Coleman acknowledges that the jury did not deny relief based on comparative fault — the jury found that the F-150 was not defective — but she argues that the verdict resulted from the jury’s prejudice against her husband for driving under the influence of alcohol and for apparently causing the accident in which he and another driver were killed. These facts, Coleman argues, should not have been before the jury because they are irrelevant to whether the truck was defective and whether enhanced injuries resulting from that defect had caused her husband’s death.
 

 ¶ 6. The Mississippi Supreme Court has held that a comparative negligence defense is available in crashworthiness suits.
 
 Es
 
 
 *227
 

 tate of Hunter v. Gen. Motors Corp.,
 
 729 So.2d 1264 (Miss.1999). The supreme court noted that the defense of comparative fault is generally available in product liability actions, and it declined to make a specific exception for crashworthiness eases, as a minority of other states have done.
 
 Id.
 
 at 1271 (¶ 2B).
 

 ¶ 7. Coleman attempts to distinguish the present case from
 
 Hunter
 
 by arguing that she seeks
 
 only
 
 damages for the enhanced injuries resulting from the allegedly defective vehicle. She claims that there was no factual controversy at trial as to which injuries resulted from the crash and which were caused by the subsequent fire and, consequently, that only enhanced injuries were at issue. Coleman notes that the court in
 
 Hunter
 
 stopped short of deciding whether a jury can apportion fault for enhanced injuries — the supreme court stated that it would visit that issue in a future case where a jury had found enhanced injuries.
 
 Id.
 
 at 1272 (¶¶ 27-28). Coleman reasons that
 
 Hunter
 
 has no application to the present case because the only purpose of Ford’s comparative fault defense was to apportion fault for her husband’s enhanced injuries.
 

 ¶ 8. We find this argument unconvincing. While Coleman may have only sought enhanced injury damages at trial, she has not demonstrated that there really was no dispute as to which of her husband’s injuries were enhanced injuries and which would have resulted from the crash alone, absent the alleged defect. Notwithstanding its comparative fault defense, Ford’s principal theory of the case was that there was no defect and consequently no enhanced injuries. Whether enhanced injuries existed was a jury question. More fundamentally, Coleman misunderstands the issue addressed in
 
 Hunter
 
 — the supreme court was concerned with whether to create an
 
 exception
 
 to the general rule that fault may be apportioned between the proximate causes of an injury.
 
 Id.
 
 at 1271 (¶ 23). The court declined to do so, saving that question for a future case where a jury actually found a defect and enhanced injuries.
 
 Id.
 
 at 1272 (¶ 27). Without this proposed exception, apportionment remains available.
 

 ¶ 9. Coleman has also argued that since the supreme court declined to address whether to create an enhanced-injury exception to comparative negligence in crash-worthiness cases, that is a question of first impression this Court must decide today. We disagree — as the supreme court made clear in
 
 Hunter,
 
 the question need not be addressed on appeal unless a jury finds a defect and enhanced injuries. In the present case, the jury found neither. It would be unwise for this Court to opine on a question of first impression when it is not necessary to decide the case before us, particularly where the supreme court has expressly saved that question for a set of facts not presented by this case.
 

 ¶ 10. The supreme court held in
 
 Hunter
 
 that a contributory negligence defense is available in crashworthiness cases. There was unquestionably a factual basis to support this defense, that is, there was evidence that Coleman’s negligence contributed to the accident that resulted in his death. We therefore conclude that the trial court properly allowed Ford to present the defense. This issue is without merit.
 

 2. Admission of Blood-Alcohol Tests; Physician/Patient Privilege
 

 ¶ 11. In her second issue, Coleman argues that the trial court erred in admitting the results of two blood-alcohol-content (BAC) tests that were conducted as part of her husband’s medical treatment after the accident. The first test, completed approximately two and one-half hours after
 
 *228
 
 the collision, showed Randy’s BAC to be 0.18 percent. The second, taken about eight hours after the accident, found his BAC to be 0.04%. From this, Ford’s expert extrapolated Randy’s BAC at the time of the accident to have been 0.23%, or more than twice the legal limit in 2001, which was 0.10%.
 
 [1]
 
 Over Coleman’s objection, the trial court permitted Ford to offer this evidence to support its comparative negligence defense. That Randy had been driving “double drunk” featured prominently in Ford’s arguments to the jury.
 

 ¶ 12. On appeal, Coleman attacks this evidence on two grounds: that it was irrelevant and that it was admitted in violation of the physician-patient privilege. She contends that the admission of her husband’s BAC test results was reversible error.
 

 ¶ 13. Coleman’s argument that evidence of her husband’s blood-alcohol level was irrelevant largely depends on her argument in the first issue, which we have found without merit. Because Ford was entitled to present a comparative negligence defense, evidence of Randy Coleman’s intoxication was clearly relevant to his fault in causing the accident.
 
 See Hunter,
 
 729 So.2d at 1277 (¶46) (“This Court has held evidence of blood alcohol levels to be admissible in automobile negligence cases.”).
 

 ¶ 14. The privilege issue presents a more difficult question. The blood-alcohol tests were not ordered by law enforcement; they were conducted by Randy’s doctors in the effort to save his life after he suffered severe burns. Randy was never prosecuted for driving while intoxicated or for any other crime related to the accident. It appears that Ford obtained these test results by subpoenaing Randy’s medical records from the treating hospitals. Additionally, the BAC results were the only strong evidence of his intoxication; it is doubtful it could have been established by other evidence, which consisted of only erratic driving prior to the collision and a few beer bottles recovered from his vehicle after the fire. None of the various responders to the accident smelled alcohol in the vehicle or on Randy.
 

 ¶ 15. Coleman relies on Mississippi Rule of Evidence 503(b), which states:
 

 A patient has a privilege to refuse to disclose and to prevent any other person from disclosing (A) knowledge derived by the physician or psychotherapist by virtue of his professional relationship with the patient, or (B) confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient’s family.
 

 At issue is the whether these test results fall under the exception provided by subsection (f) of the rule, which states:
 

 Any party to an action or proceeding subject to these rules who by his or her pleadings places in issue any aspect of his or her physical, mental or emotional condition thereby and to that extent only waives the privilege otherwise recognized by this rule. This exception does not authorize ex parte contact by the opposing party.
 

 The comment to the rule describes the effect of subsection (f) as follows:
 

 By virtue of this exception a party who seeks recovery of damages for a physi
 
 *229
 
 cal, mental or emotional injury waives the privilege for purposes of that action only and to the extent that he or she has put his or her physical, mental or emotional condition in issue by his or her pleadings. With respect to any aspect of the party’s physical, mental or emotional condition not put in issue by his or her pleadings, the privilege remains in full force and effect.
 

 Coleman concedes that she placed her husband’s physical condition at issue by seeking damages for his injuries, treatment, and death. But she notes that an attending physician testified that the BAC test was routinely given to admittees at the facilities where Randy was treated, and his BAC results did not require any changes to his treatment regimen (apparently meaning that it was effectively the same as a lower BAC or a negative result). Coleman contends that the trial court exceeded the scope of the exception by permitting Ford to use the blood-alcohol test results for a purpose not related to the issue of her husband’s injuries or care — to show that he had been intoxicated and had negligently caused the accident. Coleman cites to
 
 Sessums ex rel. Sessums v. McFall,
 
 551 So.2d 178 (Miss.1989), where the supreme court found the physician/patient privilege violated when a doctor was permitted to testify that the plaintiff, during the course of his treatment, had made certain admissions suggesting he was responsible for causing the automobile accident in which he was injured. The supreme court held that the plaintiff had “waived the privilege only as it relates to his injuries ... and expenses for treatment” and that the waiver “[did] not include the details of how the accident occurred.”
 
 Id.
 
 at 181.
 

 ¶ 16.
 
 Sessums
 
 does not require the result Coleman urges. There, the supreme court found the privilege protected a plaintiffs verbal statements to his physician that concerned
 
 only
 
 how the accident had occurred. Those statements remained privileged because they were not relevant to what the plaintiff had put at issue in his suit — his injuries and treatment — and thus they did not fall within the scope of the waiver. In the present case, Randy’s BAC was tested as part of the treatment of his injuries. An attending physician testified that BAC testing was “standard practice” and that it was “important” in the course of burn treatment. Coleman waived the privilege to her husband’s medical records by placing his injuries and the course of his treatment at issue in the lawsuit. Once the privilege was waived, the BAC test results were no longer privileged, and Ford was free to use them for any legitimate purpose at trial, including to establish Randy’s fault in causing the accident. This issue is without merit.
 

 3. Voir Dire; Challenges for Cause
 

 ¶ 17. During voir dire, Coleman challenged for cause a number of potential jurors that owned or had previously owned an F-150 Ford truck. The trial court denied all of these challenges, accepting each venireman’s individual promise that he or she could be fair and impartial. On appeal, Coleman argues that she was denied a fair and impartial jury as a result.
 

 ¶ 18. It is somewhat unclear which jurors Coleman complains that the trial court should have excused for cause. She claims the number is fifteen in her brief on appeal, but that appears to be inconsistent with the record. Coleman’s initial question to the venire was whether the potential jurors “drive or have driven” an F-150 truck — twenty answered in the affirmative. These veniremen were individually questioned on their experience with the F-150 truck — about half stated that they personally owned one. The remainder attributed their experience to spouses, parents, children, former spouses, or prior ownership.
 
 *230
 
 When Coleman moved to strike F-150 owners for cause, she stated that she was not challenging those jurors with remote connections to the vehicle or those who owned older model vehicles (apparently those dating to the early 1990s or before). Coleman specifically challenged six veniremen and specifically excluded nine from her challenge (including one who was excused because of a scheduling conflict). Of those veniremen not mentioned in Coleman’s motion, four were prior F-150 owners and one did not own an F-150 (he drove one as a company vehicle). So, despite Coleman’s representation in her brief that she had challenged fifteen F-150 owners, we find that only six were challenged. All were owners of F-150 trucks—one was a 1997 model and the rest were 2002 or newer. Four stated that they drove the F-150s personally, while two represented that the trucks were primarily driven by their husbands. Of the six F-150 owners challenged for cause, four were ultimately seated on the jury.
 

 ¶ 19. A trial judge “has an absolute duty ... to see that the jury selected to try any case is fair, impartial and competent.”
 
 Brown ex rel. Webb v. Blackwood,
 
 697 So.2d 763, 769 (Miss.1997). “Trial judges must scrupulously guard the impartiality of the jury and take corrective measures to insure an unbiased jury.”
 
 Id.
 
 (quoting
 
 Hudson v. Taleff,
 
 546 So.2d 359, 363 (Miss.1989)). Nonetheless, “the selection of jurors is a judgment call peculiarly within the province of the circuit judge, and one we will not on appeal second guess in the absence of a record showing a clear abuse of discretion.”
 
 Id.
 
 at 771 (internal quotations omitted).
 

 ¶20. Two competing forces must be considered to determine whether a potential juror can be impartial. The first is “the factor or circumstance which tends to indicate a potential for bias on the part of that juror,” and the second is “the juror’s promise that he or she can and will be impartial.”
 
 Toyota Motor Corp. v. McLaurin,
 
 642 So.2d 351, 356 (Miss.1994).
 

 ¶ 21. On appeal, Coleman relies on a series of cases where the venire presented a “statistical aberration,” an unusually large number of potential jurors that had experience with a particular attorney or physician.
 
 See, e.g., Toyota Motor Corp. v. McLaurin,
 
 642 So.2d 351, 356 (Miss.1994) (attorney);
 
 Hudson,
 
 546 So.2d at 363 (physician). In these cases, the supreme court held that “the opportunity for these persons to exercise their influence over the remainder of the jury was too great a risk.”
 
 McLaurin,
 
 642 So.2d at 358. But we think that argument was waived by Coleman’s failure to maintain her challenge for cause against all the potential jurors. Only her challenges to six of the veniremen were preserved for appeal. We note also that, although Coleman used all four of her peremptory challenges, only one was directed to an F-150 owner she had challenged for cause.
 

 ¶ 22. Moreover, all of the authorities Coleman cites concern potential jurors that had experience with attorneys or physicians—not products. These are personal relationships of great trust and confidence, not comparable to simply owning a vehicle. As the trial judge observed in denying Coleman’s challenges: “[Y]ou depend on your doctor’s advice, and you do what you’re told. You don’t necessarily talk to your Ford.” Coleman also argues that a juror who owned an F-150 truck could have personally inspected the vehicle or shared outside knowledge of the vehicle with the other jurors, but the trial court specifically instructed them not to do so. Each of the F-150 owners stated that Ford and Coleman would “start off on an even playing field.”
 

 
 *231
 
 ¶23. Coleman had an opportunity to further question these potential jurors regarding their relationship to Ford or their experiences with its products, but she did not do so. Instead, Coleman relies entirely on their statements that they owned an F-150 truck. From that, she speculates about a potential for bias, but she offers no compelling reason to disregard each juror’s affirmation that he or she could be objective. We can find no abuse of discretion in the trial court’s denial of the challenges for cause. This issue is without merit.
 

 4. Testimony of Ford’s Fire-Causation Expert
 

 ¶ 24. Ralph Newell, Ford’s fire cause and origin expert, testified as to his findings about how and where the fire began. Coleman’s experts had concluded that the fire began when fuel spilled from a ruptured flexible fuel line, located under the cab. Newell determined instead that the fire had begun inside the cab of the truck, under the driver’s seat.
 

 ¶ 25. Newell identified the initial fuel of the fire as the contents of a can of liquid electrical tape that had been punctured during the collision. Newell also identified two potential sources of ignition, but he could not specify with certainty which one had sparked the fire. He concluded that the fire had been started either by an air-conditioning capacitor or by a small, push-button-operated propane torch found in the vehicle near the ruptured can of electrical tape. Coleman urges that this rendered his opinion speculative and inadmissible.
 

 ¶ 26. Mississippi Rule of Evidence 702 states:
 

 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
 

 The Mississippi Supreme Court has adopted a modified
 
 Daubert
 
 standard that our courts are to apply when ruling on the admission of expert testimony.
 
 Miss. Transp. Comm’n v. McLemore,
 
 863 So.2d 31, 35 (¶ 7) (Miss.2003);
 
 see also Kumho Tire Co. v. Carmichael,
 
 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999);
 
 Daubert v. Merrell Dow Pharms., Inc.,
 
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In
 
 McLemore,
 
 the supreme court articulated the modified
 
 Daubert
 
 standard as follows:
 

 Under Rule 702, expert testimony should be admitted only if it withstands a two-pronged inquiry.
 
 Kansas City S. Ry. v. Johnson,
 
 798 So.2d 374, 382 [ (¶ 29) ] (Miss.2001). First, the witness must be qualified by virtue of his or her knowledge, skill, experience or education.
 
 Id.
 
 (citing M.R.E. 702). Second, the witness’s scientific, technical or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue.
 

 863 So.2d at 35 (¶ 7). Furthermore, “[t]he party offering the testimony must show that the expert has based his testimony on the methods and procedures of science, not merely his subjective beliefs or unsupported speculation.”
 
 Id.
 
 at 36 (¶ 11). Then the trial judge must determine whether the expert testimony “rests on a reliable foundation and is relevant in a particular case.”
 
 Id.
 
 (citing
 
 Daubert,
 
 509 U.S. at 589, 113 S.Ct. 2786). The focus of the trial judge’s analysis “must be solely on princi-
 
 *232
 
 pies and methodology, not on the conclusions they generate.”
 
 Id.
 
 at 36-37 (¶ 13).
 

 ¶ 27. Regarding our standard of review, “the admission of expert testimony is within the sound discretion of the trial judge.”
 
 Id.
 
 at 34 (¶ 4). Therefore, the decision of a trial judge will stand “unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.”
 
 Id.
 

 ¶ 28. Newell testified that he had relied largely on the observations of witnesses to the fire, who had stated that shortly after the collision, smoke was coming from inside the cab of the F-150 but not from underneath the vehicle. If the fire had begun under the vehicle, as Coleman alleged, to reach the inside of the cab it would have had to burn through a rubber grommet in the floorpan. Newell examined the grommet and concluded that it would have burned out more easily from above than below. This would have been consistent with the accounts of witnesses that the fire appeared under the vehicle only later. It was undisputed that the flexible fuel lines, located underneath the cab, had eventually burned after the accident.
 

 ¶ 29. A punctured can of liquid electrical was found in Randy’s vehicle after the accident, under the driver’s seat. Newell testified that liquid electrical tape was “highly flammable,” and he concluded after examining the vehicle and conducting various experiments that the liquid electrical tape had been the initial fuel for the fire. It melted the underside of the driver’s seat, and burning foam dripped onto the floor, spreading the fire downward. This burned the rim of the grommet, which then fell out and allowed the fire to spread under the cabin to the fuel lines.
 

 ¶ 30. Coleman’s attack on Newell’s expert opinion focuses on his inability to specifically identify the source of the spark
 

 that ignited the liquid electrical tape— Newell concluded that it had been either a push-button torch or an air-conditioning capacitor. Neither could be excluded as a possible ignition source. Coleman repeatedly asserts that this reliance on a mere “possibility” reduced Newell’s opinion to speculation, but she offers little explanation of why. Newell never implied that his methodology required him to determine the exact ignition source. Instead, it appears that he relied on the conclusion — which he stated he had reached to a reasonable degree of certainty — that one of the two had started the fire. Coleman offers no attack on this finding and no explanation of why Newell would have had to identify the exact ignition source to render his opinion.
 

 ¶ 31. Coleman falls far short of demonstrating that the trial judge abused his discretion in admitting Newell’s testimony. This issue is without merit.
 

 5. Note-taking Instruction
 

 ¶ 32. The trial court permitted the jurors to take notes during the trial, but gave an abbreviated preliminary instruction on note-taking. Coleman argues this was error.
 

 ¶ 33. Rule 3.14(2) of the Uniform Rules of Circuit and County Court states in relevant part:
 

 The court shall instruct the jury as to whether note taking will be permitted. If the court permits jurors to take written notes, the trial judge shall give both a preliminary instruction and an instruction at the close of all the evidence on the appropriate use of juror notes. These instructions shall be given in the following manner.
 

 [[Image here]]
 

 (b) If you would like to do so, you may take notes during the course of the trial.
 
 *233
 
 On the other hand, you are not required to take notes if you prefer not to do so. Each of you should make your own decision about this. If you decide to take notes, be careful not to get so involved in note taking that you become distracted from the ongoing proceedings.
 

 Notes are only a memory aid[,] and a juror’s notes may be used only as an aid to refresh that particular juror’s memory and assist that juror in recalling the actual testimony. Each of you must rely on your own independent recollection of the proceedings. Whether you take notes or not, each of you must form and express your own opinion as to the facts of this case. An individual juror’s notes may be used by that juror only and may not be shown to or shared with other jurors.
 

 The preliminary instruction given by the trial judge, however, was abbreviated:
 

 BY THE COURT: There’s — there’s one rule to note-taking. If one of you take notes, you’ve all got to take notes. The reason being, you can’t share your notes. Your notes are only for your own recollection.
 

 [[Image here]]
 

 [Ultimately, when it’s time for you to deliberate, you’ll have those notepads with you, but you can only use them to refresh your memory, not each other’s memory.
 

 ¶ 34. Coleman urges that failure to follow the form instruction word-for-word was error, but she does not argue it was reversible error — in fact, she makes no argument whatsoever to support this issue. Certainly, she has not demonstrated that the trial court’s variances from the form language caused her any prejudice. It is also undisputed that the trial court gave the form instruction at the close of the evidence:
 

 Members of the Jury, shortly after you were selected I informed you that you could take notes and I instructed you as to the appropriate use of any notes that you might take. Most importantly, an individual juror’s notes may be used by that juror only and may not be shown to or shared with other jurors. Notes are only a memory aid[,] and a juror’s notes may be used only as an aid to refresh that particular juror’s memory and assist that juror in recalling the actual testimony. Each of you must rely on your own independent recollection of the proceedings. Whether you took notes or not, each of you must form and express your own opinion as to the facts of this case. Be aware that during the course of your deliberations there might be the temptation to allow notes to cause certain portions of the evidence to receive undue emphasis and receive attention out of proportion to the entire evidence. But a juror’s memory or impression is entitled to no greater weight just because he or she took notes, and you should not be influenced by the notes of other jurors.
 

 Thus, during your deliberations, do not assume simply because something appears in your notes that it necessarily took place in court.
 

 ¶ 35. Coleman not only fails to demonstrate error on appeal, but she made no objection to the trial court’s preliminary instructions at trial. Failure to make a contemporaneous objection to preliminary instructions waives this argument on appeal.
 
 Younger v. State,
 
 931 So.2d 1289, 1290 (¶ 4) (Miss.2006). “In order to preserve a jury instruction issue on appeal, a party must make a specific objection to the proposed instruction in order to allow the lower court to consider the issue.”
 
 Crawford v. State,
 
 787 So.2d 1236, 1244-45
 
 *234
 
 (¶ 35) (Miss.2001). This issue is without merit.
 

 6. Closing Argument; Comment on the Evidence
 

 ¶36. During its closing argument, Ford’s attorney stated the following:
 

 [B]ut where is the proof that an F-150 4x4 1999 vehicle is a defective design? If it was, we would have heard loads of evidence about accident after accident. We haven’t heard that.
 

 This appears to be an accurate statement regarding the evidence presented at trial. Coleman’s counsel offered an objection, which was sustained; however, the trial court declined to admonish the jury to disregard the comments. Coleman urges error, but she again offers no real argument on the issue. Instead, she complains that she could not produce evidence of other similar accidents because Ford was not cooperative in its discovery responses. It appears that Coleman cannot argue this directly because she never filed a motion to compel in these discovery disputes. “Under our rules of civil procedure, failure to make or cooperate in discovery should first be resolved by making a motion in the proper court requesting an order compelling such discovery.”
 
 Ford Motor Co. v. Tennin,
 
 960 So.2d 379, 393 (¶ 47) (Miss.2007) (quoting
 
 Caracú v. Inti Paper Co.,
 
 699 So.2d 546, 557 (¶ 19) (Miss.1997)). At any rate, Coleman cites no authority in her brief on appeal to support her argument on the closing argument, and consequently, this issue is procedurally barred on appeal.
 
 Ruff v. Estate of Ruff
 
 989 So.2d 366, 372 (¶ 24) (Miss.2008).
 

 7. Exclusion of Deposition Testimony
 

 ¶ 37. Coleman complains that the trial court erred in excluding from evidence several portions of the deposition of Sunil Sharma, an engineer at Ford and its designated corporate representative under Rule 30(b)(6) of the Mississippi Rules of Civil Procedure.
 

 ¶ 38. We review a trial court’s decision to admit or exclude evidence for an abuse of discretion.
 
 Mingo v. State,
 
 944 So.2d 18, 28 (¶ 27) (Miss.2006). Coleman claims that four separate rulings by the trial court were erroneous, but she only offers a cursory argument in support of each assertion. She argues, in a sentence or two for each ruling, that the excluded portions of the deposition testimony were relevant to her claims against Ford — but Coleman makes no effort to demonstrate that the rulings were prejudicial.
 

 ¶ 39. Under Mississippi Rule of Evidence 103, “[e]rror may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected.... ” Consequently, “[w]e will not reverse the trial court’s evidentiary ruling unless the error adversely affects a substantial right of a party.”
 
 Mingo,
 
 944 So.2d at 28 (¶ 27). “In other words, the admission or exclusion of evidence must result in prejudice or harm if the cause is to be reversed on that ground.”
 
 Harper v. State,
 
 887 So.2d 817, 829 (¶ 57) (Miss.Ct. App.2004).
 

 ¶ 40. The trial court allowed the great majority of the deposition into evidence, and it appears that all of excluded testimony was only remotely relevant or was duplicative of evidence Coleman later offered at trial. Moreover, Coleman again fails to cite any authority in support of this issue, and it is procedurally barred on appeal.
 
 Ruff,
 
 989 So.2d at 372 (¶ 24).
 

 8.Jury Instructions
 

 ¶ 41. Coleman complains that the trial court erred in granting and refusing various jury instructions. The first part of her argument is addressed to the court’s
 
 *235
 
 instructions on comparative negligence. Coleman relies entirely upon her prior arguments that the jury should not have been allowed to consider comparative fault in a crashworthiness suit, which we have already found without merit.
 

 ¶ 42. Neither of Coleman’s two remaining arguments concerning jury instructions were preserved for appeal. First, she urges that the trial court erred in giving instruction D-3, which stated as given that “[t]he fact that an accident occurs does not mean the product involved was defective .... ” Although she did object to the specific language of D-3, as it was originally offered, Coleman withdrew the objection after the trial court modified it, abrogating her objection. Coleman also contends that the trial court should have given instruction P-20, but it is plain from the record that she withdrew it herself after the trial court agreed to give another instruction she had offered, P-7.
 

 ¶ 43. This issue is without merit.
 

 9. New Trial
 

 ¶ 44. In her final issue, Coleman urges that the trial court erred in denying her a new trial based on the various errors previously alleged. This issue is entirely a rehashing of her prior arguments, and as we found no error above, we find no abuse of discretion in the trial court’s denial of her motion for a new trial. This issue is without merit.
 

 ¶ 45. THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. BARNES, J., NOT PARTICIPATING.
 

 [1]
 

 . The limit is presently 0.08%. See Miss.Code Ann. § 63-11-30(1) (Supp.2009).