BARNES, J„
for the Court:
¶ 1. This case arises from a car accident involving one vehicle driven by Leslie “Terry” Singley (Singley). On the morning of February 14,2008, Singley was. traveling westbound on Interstate 20 in Clinton, Mississippi, in his Ford F-150 pickup truck. Having set his cruise control at 65 miles per hour (mph), he was approaching a bypass near the Natchez Trace Parkway. While Singley was traveling in the left lane, passing a caravan of Entergy trucks, he inexplicably lost consciousness, veered off the roadway, and collided with a REdi-rective Gating ENd Terminal (“REGENT-C”) and a length of W-beam guardrail used to shield a bridge parapet for the Natchez Trace Parkway. As a result of the impact, a segment of the guardrail 'entered the vehicle’s compartment and amputated Singley’s right leg below the knee.
■¶ 2. Singley and his wife, Brenda, filed suit on September 30, 2009, against all entities involved in the design, testing, manufacturing, installation, and sale of the REGENT-C terminal. The REGENT-C end terminal was designed by Bryson Products Inc. (BPI) and manufactured by Central Fabricators, Key LLC was hired by the Mississippi Department of Transportation (MDOT) as the primary contractor; Atwood Fence Company was the subcontractor hired to install the product. The design of the REGENT-C end terminal was intended to serve the dual function of “gating” and redirecting a vehicle in the case of a side-impact collision.[1] Its design was based on a similarly designed end terminal, the slotted rail terminal (SRT), manufactured by Trinity Highway .Products (Trinity).[2] Although both designs in *711 corporated slotted, rail panels, standard anchor assembly, and wooden posts, the REGENT-C also used a 3/4 inch steel cable, which extended .the entire length of the system. The cable was woven through the slotted rail at certain points and connected by two cable boxes mounted on the non-traffic side of the system.[3]
¶3. E-Tech Testing Inc. and Energy Absorption Systems Inc. (EAS) were contracted to perform the NCHRP Report 350 testing for the REGENTt-C end terminal[4] The REGENT-C was subjected to Tests 3-30, 3-31, and 3-35 before obtaining approval from the Federal Highway Administration' (FHWA). In a letter dated September 5, 2002, the FHWA informed EAS that the REGENT-C met the “evaluation criteria for an NCHRP Report 350 w-beam guardrail terminal at -test level 3 (TL-3) and ... ■ may be used on the National Highway System[.]” The' approval did contain one condition: noting that the truck used in one test “came to a stop straddling the rail approximately 45 m[eters] downstream from the terminal,” forty-five (45) meters was set as “the minimum length of rail that should be installed when the barrier is used along a high-speed roadway to shield a bridge parapet[.]”
14. The Singleys amended their complaint: three times, with the third amended complaint filed on March 4, 2011. The principal charge in the complaint was that the REGENT-C end terminal attached to the guardrail was defectively designed and unreasonably dangerous. The Singleys alleged that instead of deflecting his vehicle, as it should have been “designed, constructed, and installed” to do, the REGENT-C end terminal failed, causing the guardrail to penetrate the truck’s passenger compartment, which resulted in Sing-ley’s injuries. They also asserted claims of strict liability, negligent and/or intentional misrepresentation, and loss of consortium.
¶ 5. To support their claims, the Singleys provided expert testimony from Doug Head and Anne Stodola, Head, an engineer and. accident reconstructionist, stated that the REGENT-C was. defective and unreasonably dangerous because it did not comply with the performance guidelines. Head contended that had the REGENT-C also been subjected to Test 3-11, which tests longitudinal barriers, its defective condition “would have been readily apparent.”[5] Head also submitted an affidavit *712 after discovery had been concluded that additionally asserted the Trinity Defendants had “improperly altered the original, proposed design of the REGENT-C submitted for FHWA approval during Test 3-35 by attaching the slotted rail to the wooden post at Post 2.”
¶ 6. Stodola, a mechanical engineer and accident reconstructionist, opined that the REGENT-C design had a defect that caused the guardrail to shear and pierce the vehicle’s compartment. Specifically, she stated that because the “downstream” cable box was positioned next to an area where slots were located in the guardrail, this created a “flexion point” and made the REGENT-C end terminal subject to “pocketing,” causing the terminal to “snag” Singléis truck instead of redirecting it. She declined, however, to offer any opinion in her deposition regarding a feasible alternative design. Stodola did submit a subsequent affidavit on June 25, 2013, after discovery had been completed, in which she claimed that the SRT end-terminal design was a “mechanically feasible and available alternative design to the REGENT-C system at issue.”
¶ 7. The Trinity Defendants[6] moved to exclude this expert testimony under Dauberf[7] and filed motions for summary judgment.[8] On October 15, 2013, the trial court granted the Defendants’ motions for summary judgment, concluding that the expert opinions of Head and Stodola did not prove causation and were “insufficient to withstand summary judgment.” Although noting that both Head and Stodola were generally qualified as experts, the trial judge found that Head’s testimony was “unreliable” and that Stodola admitted she “would have to defer to other experts when it comes to guardrail design[.]” The trial judge also approved the Defendants’ motion to strike an affidavit by Head submitted after discovery had concluded, which referenced a secondary theory of liability.
¶8. The Singleys now appeal, raising several assignments of error regarding the trial court’s grant of summary judgment.[9] Upon review, we find the trial judge properly excluded certain expert testimony in this case. We further conclude that the remaining expert testimony is insufficient to establish a product-liability claim under Mississippi law. We further find no genuine issue of material fact exists as to the Singleys’ remaining claims on appeal. Therefore, we affirm the trial court’s grant of summary judgment.
STANDARD OF REVIEW
¶ 9. A trial court’s grant or denial of a motion for summary judgment is reviewed de novo. Karpinsky v. Am. Nat’l Ins. Co., 109 So.3d 84, 88 (¶ 9) (Miss.2013). “[I]f the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law,” *713 then summary judgment “shall be rendered.” M.R.C.P. 56(c). The evidence must be viewed “in the light most favorable to the party against whom the motion has been made.” Karpinsky, 109 So.3d at 88 (¶ 9).
ANALYSIS
I. Whether the trial court’s exclusion of Head and Stodola’s expert testimony was an abuse of discretion.
¶ 10. The crux of the Singleys’ argument is that Singley hit the REGENT-C end terminal at an angle and speed within the parameters of the NCHRP 350 testing; therefore, since the REGENT-C end terminal failed to redirect Singley’s vehicle and caused him severe injury, the design of the end terminal was defective and was not NCHRP 350 compliant. The Singleys provided testimony by the two experts, Head and Stodola, to support their claim that the severity of the impact was within the testing parameters and that the REGENT-C’s design was defective. The Defendants, on the other hand, contend that the severity of the impact to the end terminal and guardrail was of a magnitude far exceeding “the performance tolerances established by Report 350 for crash-testing end terminal devices,” and the Singleys failed to provide sufficient evidence that the REGENT-C failed due to a design defect.
¶ 11. We agree with the trial judge’s conclusion that Head’s expert testimony — that the REGENT-C end terminal should have been subjected to Test 3-11 before being deemed compliant under NCHRP 350 — should be excluded, as it is not based on any industry methodology or peer review. As this Court has opined:
“[T]he party offering the testimony must show that the expert has based his testimony on the methods and procedures of science, not merely his subjective beliefs or unsupported speculation.” Then the trial judge must determine whether the expert testimony “rests on a reliable foundation and is relevant in a particular case.” The focus of the trial judge’s analysis “must be solely on principles and methodology, not on the conclusions they generate.”
Coleman v. Ford Motor Co., 70 So.3d 223, 231-32 (¶ 26) (Miss.Ct.App.2011) (citing Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 36-7 (¶¶ 11, 13) (Miss.2003) (internal citations omitted)). When asked what 350-level guardrail end terminal had been accepted using Test 3-11, Head acknowledged: “I don’t know of another one.” Deposition testimony revealed that Head’s averment that the REGENT-C end terminal be evaluated using Test 3-11 was based only on his subjective opinion.
Q. Do you know anyone at FHWA that has contemplated putting test 3-11 within the seven test matrix[10] of test level 3 devices?
A. Within the matrix, I don’t know of anybody that’s thought of that. I think[,] when they look at that it’s labeled as length of need redirective, that they will agree with me that the strength requirements of 3-11 need to be met by that section.
[[Image here]]
Q. All right. So ... my point is the people that come up with the test level [seven] matrix — the seven text matrix — were an array of people from DOT to academicians to Ph.D. engineers to people who design products who came up with that standard, right?
*714 A. Right.
Q. And those folks, in their collective •wisdom, did not see fit to put test 3-11 within that seven test matrix. You would agree with that, wouldn’t you?
■ A. I agree.
The Singleys admit in their brief that it “may very well be true” that no designer or manufacturer of end terminals test for “ ‘length of need’ according to the parameters of Test 3-11.”[11] We find no abuse of discretion in the trial court’s decision to exclude this testimony.
¶ 12. Regarding the issue of the. speed and angle of the impact of Singley’s truck against the guardrail, we agree there are disputed issues of fact. Eyewitnesses claimed that Singley was traveling at a speed of “over 70” mph, and Singley’s own statement was that his cruise control had been set on 65 mph prior to the incident.[12] One eyewitness, Paul Dhaliwal, .who was driving one of the Entergy trucks, stated that Singley’s truck impacted the guardrail at approximately a thirty-degree angle. Dhaliwal was traveling directly behind Singley. Another witness, Carlos Ford, said that Singley’s truck “veered” over in front of the, Entergy truck in which he was a passenger. The driver of that Entergy truck, Russ Walker, said in a recorded statement that when Singley “started corning over it was a bee line for that,guardrail.”
¶ 13. Head, however, disregarded this testimony concerning the angle, testifying it was “not reasonable” and that Dhaliwal was “just flat wrong.” Instead, Head focused on the testimony of Walker and Ford that Singley “drifted” into the other lane.[13] Head’s opinion was that Singley struck the guardrail at an approximate angle of nine degrees. He said that if the impact was steeper than five to ten degrees, it would require “the vehicle to make a turning maneuver instead of a drifting maneuver.” He stated in his deposition:
A. There’s no evidence [Mr. Singley] turned. The witnesses all say he just drifted.... [I]f he had been further up, they’re going to describe him as he turned into the barrier.... They didn’t. They consistently say he drifted — they—into , the barrier. That keeps him on a relatively straight line. If they’d said he turned into it or he had a heavy veer, then he could be up . here and turn into it. But nobody has described that. They all say he just drifted.
*715 Q. Other than Paul [Dhaliwal], which you discounted?
[[Image here]]
A. Paul and his 30 degrees I disagree with.
¶ 14. Stodola opined that the cruise control on Singley’s car was likely not engaged, although Singley himself claimed that it was set at 65 mph before the accident. But she admitted that there was no physical evidence whether Singley’s cruise control was off or on. Like Head, she also stated.in her report that the,angle of impact was between eight to ten degrees. However, the Defendants argue, that Sto-dola “did pot perform any physical testing or computerized modeling to verify whether the impact severity of the Singley accident was within or far exceeded the performance tolerances established by Report 350.”
¶ 15. We cannot say that the presence of these disputed facts is fatal to the Defendants’ award of summary judgment. Even if a jury gave greater weight to the experts’ opinions that the impact was within the parameters of the NCHRP 350 testing, the Singleys still had to demonstrate that a genuine issue of material fact existed that the REGENT-C end terminal- was defectively designed and the defective design was the cause of Mr. Singley’s injury. They also had to provide evidence that a reasonable alternative design existed that would have prevented the accident in question.
¶ 16. The trial court barred the Sing-leys’ claim under the Mississippi Products Liability Act (MPLA) because their experts failed to provide any testimony that a reasonable alternative design existed for the end terminal. Upon review of the evidence, we agree with the trial court’s finding that the expert, opinions in this case failed to meet Daubert standards. ¶ 17. Mississippi Code Annotated section 11 — 1—63(f) (i) — (ii) (Rev,2014) of the MPLA states: •
In any action alleging that a product is defective because of its design pursuant to paragraph (a)(i)3 of this section, the manufacturer, designer or product seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer, designer or seller[,] .,. [t]he manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should, have known, about the danger that caused the damage for which recovery is sought; and .... [t]he product failed to function as expected and there existéd a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.
As the Mississippi Supreme Court has explained:
If an alternative design could have been practically adopted.at the .time of sale, and if the omission of such an alternative design rendered the product not reasonably safe, then a design is defective. [Restatement (Third) of Torts: Prod. Liab. § 2 (1998).] This unique element of proof for [a] design defect claim, is premised on the notion that liability for harm caused by product designs should' attach only when the harm is 'reasonably preventable. Restatement (Third) of Torts: Prod. Liab. § 2(f) (1998). For this reason, demonstrating a feasible alternative design as proof of a design defect is elemental to a claimant’s prima facie case. Accordingly, *716 once sufficient evidence has been presented to the judge so the judge can determine that reasonable people could conclude a reasonable alternative design could have been practically adopted, the issue can be entrusted to a trier of fact. Id.
Williams v. Bennett, 921 So.2d 1269, 1275 (¶ 16) (Miss.2006).
¶ 18. Head testified that other Test Level 3-accepted slotted rail end terminals existed that could have been used, such as the SRT. Yet when asked how the SRT would have performed if impacted under the same conditions, Head testified: “I have not done that analysis. I don’t know.”
Q. Okay. So as you sit here today, your testimony is that you haven’t analyzed the SRT to determine if it is a reasonable design alternative.
A. I have not analyzed it to see if it would stand the same impact that the REGENT-C failed.
Head explained that his opinion that the SRT would have been a reasonable alternative design was based on the fact it was “350 certified.” Therefore, according to Head, “[tjhat on its surface makes it a reasonable device to use.” Head’s opinion fails to establish that the SRT was a safer feasible alternative, as the REGENT-C design was also evaluated and 350-certi-fied under the FHWA.
¶ 19. Furthermore, Stodola declined to offer any testimony during her deposition that the SRT was a safer design, stating she was not qualified to give that opinion.
Q. Are you going to be offering an opinion in this case about alternative designs of guardrail treatments that you contend were safer alternative designs to the REGENT-C?
A. Not intentionally.
[[Image here]]
I’m not here to say that the SRT is a better design. I’m just here — based on what we could tell, it is different. ... So as I said, I would not intentionally say that — I’m not here to say the SRT is a better design; I’m just saying there’s a design difference.
Q. Well are you going to say that the SRT was a safer alternative design?
A. I have not evaluated that and would not attempt to do that.
[[Image here]]
Q. [Yjou’re not going to offer an opinion that the SRT or any other guardrail end treatment system on the market was a safer alternative design that • the REGENT-C?
A. Correct. I would leave that to the experts.
Although Stodola later stated that there was a possibility that the SRT “may have” performed in a manner that would have prevented the incident, she noted that she had done no testing to make that determination.
¶20. However, after the Defendants filed their motions to exclude the Singleys’ expert testimony, the Singleys filed an affidavit by Stodola on June 25, 2013, in which she averred that the SRT was a “mechanically feasible and available design alternative design to the REGENT-C system at issue.” She noted that the REGENT-C was modeled after the SRT design, but in the SRT design, the steel cable does not run the full length of the termination, “eliminating the need for a second cable box[.]” As this Court has noted, a nonmovant may not attempt to defeat a motion for summary judgment “with an affidavit of a witness that contradicts facts asserted in that witness’s prior deposition testimony, unless the affidavit explains the discrepancy.” Jamison v. Barnes, 8 So.3d 238, 245 *717 (¶ 17) (Miss.Ct.App.2008) (citing Foldes v. Hancock Bank, 554 So.2d 319, 321 (Miss.1989)). It is apparent that Stodola’s affidavit was an attempt to respond to the Defendants’ argument that neither expert had demonstrated a feasible alternative design existed that was safer than the REGENT-C. Stodola did not explain the discrepancy in her testimony, and she had earlier stated she “would not attempt” to testify that the SRT was a safer design.
¶ 21. We find that the trial judge properly excluded certain expert testimony of Head and Stodola. “Summary judgment may not be defeated through expert opinions that are not based on facts but instead are based on a guess, speculation, or conjecture.” Rogers v. Barlow Eddy Jenkins P.A., 22 So.3d 1219, 1225 (¶ 21) (Miss.Ct.App.2009). The remaining evidence is insufficient to raise a genuine issue of material fact as to whether the REGENT-C was defectively designed; further, the Singleys have offered insufficient evidence that a defective design caused Singley’s injury.
II. Whether the trial court abused its discretion in excluding the Sing-leys’ evidence regarding the existence of a bolt at Post 2 during Test 3-35.
¶ 22. In an affidavit filed on June 28, 2013, Head claimed that for Test 3-35, the Defendants had “improperly altered the original, proposed design of the REGENT-C” submitted to the FHWA, by attaching the guardrail to Post 2, using a bolt.[14] Head opined that “[t]o a reasonable degree of engineering certainty, by attaching the rail at this location, Defendants were able to transfer at least some portion of the forces exerted upon the terminal to Post 2, assisting the terminal system as whole along its length and redirect the testing vehicle after impact.” But Head also noted that “[a]n exact analysis of the specific amount of force transferred to the post is not possible” because the Defendants never “tested the unaltered design of the REGENT-C (without the rail attached at Post 2) for comparison purposes.” Thus, he concluded that the alteration of the design “for purposes of Test 3-35 — [meant] that the design of the REGENT-C installed by [the Defendants] ... was never demonstrated to pass the minimum performance guidelines set forth in NCHRP 350 under Test 3-35.”
¶ 23. However, as Head’s affidavit was not filed until several months after the expert-witness depositions had been conducted and only four months before the trial was scheduled, the Defendants moved to strike the testimony. The trial judge granted the motion, concluding the evidence failed “to abide by the terms of the scheduling order.”
¶ 24. The Singleys argue that the trial court’s granting of the Defendants’ motion to strike the evidence concerning the existence of a bolt at Post 2 was an abuse of discretion. They contend that this evidence was “not an attempt to state a liability claim,” but merely rebuttal evidence and, therefore, should have been admitted. Upon review, we find the evidence was untimely and properly excluded.
¶ 25. In Howell v. Holiday, 155 So.3d 839, 844 (¶ 15) (Miss.Ct.App.2013), this Court found that an expert’s supplemental report, which contained a new theory of *718 liability and which was submitted less than a- week prior to trial, “violate[d] Rule 4.04(A) of the Uniform Rules of Circuit and County Court because Howell failed to reveal the new subject matter of [the expert’s] testimony at least sixty days before trial, and no special circumstances existed to justify Howell’s, late designation of this opinion.” Thus, Rule 4.04(A) applies not only to late designation of an expert witness, but also the “supplementation of the reports of experts who have already been designated.” Id. at 845 (¶ 15). “Allowing [the expert] to testify, on this matter would result in undu[e] and irreversible prejudice to Holiday.” Id.
¶ 26. ' Admittedly, the expert supplementation in the present case was submitted more than sixty days before the scheduled trial date, and therefore, was not a violation of Rule 4.04(A). “However, compliance with Rule 4.04 does not excuse a party’s failure to adhere to a scheduling order.” Douglas v. Burley, 134 So.3d 692, 698 (¶ 15) (Miss.2012). A trial court “has. considerable discretion in matters pertaining to discovery” and “a duty to maintain control of the docket and ensure the efficient disposal of court- business.” Venton v. Beckham, 845 So.2d 676, 684 (¶ 25) (Miss.2003) (citations and internal quotations omitted). In this case, we agree with the trial court’s finding that, due to the complexity of the issues in this case, allowing a new theory of liability only four months prior to the scheduled trial would be prejudicial. New expert depositions would have to be conducted, and the Defendants allowed time to find an expert witness to counter Head’s new theory.
¶ 27. Consequently, we find no abuse of discretion in the trial court’s grant of the Defendants’ motion to strike this evidence. Moreover, the Singleys acknowledge they “never claimed that the presence (or lack thereof) of a bolt attaching the REGENT-C’s slotted rail at post 2 had any impact or effect whatsoever on the performance of the REGENT-0 during the subject accident.” Thus, this evidence would not have been sufficient to create a genuine issue of material fact necessary to preclude summary judgment.
III. Whether the trial court erred by deciding disputed issues of fact concerning the FHWA acceptance letter.
¶ 28. The Singleys claim that the trial court erroneously interpreted the “meaning and intent of the FHWA” in regard to the condition in the FHWA’s acceptance letter that “the minimum length of rail ... installed” should be approximately 45 meters (approximately 148' feet). We find nothing in the record to support this claim. The trial court did address the parties’ various arguments regarding this issue in its order, but made no findings of fact regarding the letter’s intent. The trial judge merely concluded that plaintiffs failed to “point to a specific breach of duty that caused injury.”
¶ 29. ' Furthermore, the evidence shows that the guardrail and' terminal were installed according to MDOT specifications — 112.5 feet of guardrail was installed, along with the REGENT-C end terminal, which was 37;5 feet, for a total installation of 150 feet. The Singleys’ expert, Head, testified that the REGENT-C end terminal should not have been used in that particular “barrier situation,” apparently interpreting the condition in the letter as requiring 45 meters of guardrail, Without including the additional end-terminal length. As Key and Atwood noted in their appellees’ brief, the enclosures with the FHWA acceptance letter, which include the test results, show that the 45 meters was measured from the start of the RE *719 GENT-C end terminal in the test. This issue is without merit.
IV. Whether the trial court erred in failing to address the Singleys’ remaining ¡claims.
¶ 30. Consequently, we further find the evidence is insufficient to support the Singleys’ remaining claims of strict liability, negligent and/or intentional misrepresentation, and their request for punitive damages. “With the adoption of [section] 11-1-63, common law strict liability, as laid out. in State Stove Mfg. Co. v. Hodges, 189 So.2d 113 (Miss.1966), is no longer the authority on the necessary elements of a products liability action.” Huff v. Shopsmith, Inc., 786 So.2d 383, 387 (¶ 11) (Miss.2001). As we have fund that there was no genuine issue of material fact as to whether the REGENT-C was defectively designed, this claim fails as a matter of law. The Singleys also claim that the Trinity Defendants made “certain representations, explicitly and/or implicitly to users, consumers, and the general public, concerning the REGENT-C,” which they assert were negligent and/or intentional misrepresentations. As the Singleys have cited no relevant authority to support this claim, we decline to address this issue. See Barrow v. May, 107 So.3d 1029, 1038 (¶ 20) (Miss.Ct.App.2012). Lastly, as the Singleys’ claims were insufficient to withstand summary judgment,' any issue brought regarding punitive damages is moot and not properly before this Court.
¶31. Accordingly, we affirm the trial court’s grant of summary judgment to the Defendants.
¶ 32. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED, ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, C.J.', GRIFFIS, P.J., ISHEE, ROBERTS, CARLTON AND FAIR, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., DISSENTS WITH SEPARATE WRITTEN OPINION. MAXWELL, J., NOT . PARTICIPATING.

. The 350 Report, promulgated by the National Cooperative Highway Research Program (NCHRP) in 1992, provides the recommended procedures for evaluating the performance of Safety features, including guardrail end terminals. It defines a terminal as "[a] device designed .to treat the end of a longitudinal barrier,” such as a W-beam guardrail, and it functions by "(a) decelerating a vehicle to a safe stop within a relatively short distance, (b) permitting controlled penetration of the vehicle behind the device, (c) containing and redirecting the vehicle, or (d) a combination of a, b, and c.”

. Trinity Highway Products merged with Central Fabricators in 2007, acquiring- the assets *711 of BPI. These assets' include the rights pertaining to the REGENT-C patent. Although BPI maintains a corporate existence, Central Fabricators ceased to exist following the merger. For ease of discussion, we will refer to all the Defendants as a whole, unless otherwise indicated.

. Another difference between the SRT and the REGENT-C is the location of the slots. The REGENT-C has three identical rail panels with slots continuing to the terminal end, where it is attached to the non-slotted steel w-beam guardrail. The SRT’s -slots end before the transition to the guardrail, just after Post 3.

. The Federal Highway ‘ Administration (FHWA) adopted Report 350 as the standard for all federal-aid construction projects involving public roadways. Test Level 3 of Report 350 sets 'the parameters for crash testing both the gating capacity and redirective capacity of an end-terminal device. According to NCHRP Report 350, up to seven tests are recommended to evaluate redirective/gating devices in Test Level 3 (3-30 through 3-36).

.According to the NCHRP 350 Report/Test 3-11 is a recommended test to evaluate the length of need for longitudinal barriers.' The 350 report defines a longitudinal barrier as "[a] device whose primary functions are to prevent vehicular penetration and to safely redirect an errant vehicle away from a roadside or median hazard.” Length of need is defined as ‘'[t]hat part of a longitudinal barri- ■ er or terminal designed to contain and redirect a vehicle.” ■ ,

. These include Trinity, BPI, E-Tech Testing Services Inc., Central Fabricators, and EAS.

. Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. Key and Atwood each filed separate motions for summary judgment, asserting that the guardrail and end terminal were installed in accordance with the manufacturer’s instructions and that they did not breach any duty owed to the plaintiffs. Key and Atwood also joined the Trinity Defendants' motion to exclude the plaintiffs’ experts and for summary judgment. •.

.Although the Singleys raise nine issues in their brief, in the interest of clarity and efficiency, these multiple claims have been combined into three issues.

. See n. 2.

.We note that Head also admitted he knew of no other guardrail end terminal that had ever been accepted using Test 3-11.

. The paramedic who assisted Singley after the accident stated that he thought Singley told him "that he had his cruise set at 77[mph],” but the paramedic also acknowledged that he could not "say with certainty [Singley] said that.”

. The term “drifting” was suggested by counsel for the Singleys during Ford's and Walker’s depositions before the witnesses actually used that term. The following is an example of this from a portion of Walker’s testimony:
[Counsel for Singleys]: Was it as if he was drifting into your lane or what was he doing?
Russ Walker: Oh, yeah. Oh, yeah, it was, uh, it was definitely, he was coming straight over.
During Ford’s testimony, counsel for the Singleys also questioned: "Now, did the vehicle drift over those lanes from left to right ... or had it already gotten onto a straight trajectory?” While Ford had previously used the term "veered” to describe the vehicle’s trajectory, Ford replied to the question: "It was drift. It wasn’t a direct line of travel. Just gradually to the right.”

. Head stated that Test 3-30 used the original REGENT-C design (with the slotted rail not bolted at Post 2) submitted to the FHWA and that BPI, Central Fabricators, EAS, and E-Tech Testing "notified the FHWA that they altered the design to attach the slotted rail to Post 2” for Test 3-31. He renders no claims or opinions concerning the attachment of the bolt to Post 2 in Test 3-31.